## R. P. BARNETT v. THE STATE.

### No. 3481. Decided March 31, 1915.

### Rehearing denied May 12, 1915.

**1.—Murder—Indictment.**

Where, upon trial of murder, the indictment followed approved precedent, the same was sufficient.

**2.—Same—Change of Venue—Discretion of Court.**

Where, upon trial of murder, the motion for a change of venue was on the ground of prejudice against the defendant and a dangerous combination of influential persons, which was controverted by the affidavits of the State, which controverted the means of knowledge of the compurgators, and the trial judge heard evidence, and in his discretion, overruled the motion, there was no error, although the evidence was conflicting. Davidson, Judge, dissenting.

**3.—Same—Rule Stated—Change of Venue—Judicial Discretion.**

Unless it is clear that the trial court had abused his judicial discretion, his action in refusing a change of venue will not require a reversal. Following Tubb v. State, 55 Texas Crim. Rep., 606, and other cases.

**4.—Same—Change of Venue—Insufficiency of Evidence—Practice on Appeal.**

Where, upon appeal from a conviction of murder, the appellant claimed that the court should have changed the venue, this court, after a careful in-

spection of the record, does not believe itself justified in view of the action of the trial court, in conflicting evidence, in reversing the judgment on the failure of the trial court to grant a change of venue. Davidson, Judge, dissenting.

### 5.—Same—Special Venire—Jury and Jury Law.

Where the bills of exception showed, as qualified by the trial court, that at the time the names of the special veniremen were called, the court declined to postpone the case until their attendance could be had, and that when they did return and were examined, the defendant had a number of peremptory challenges left and that the last juror was accepted without any challenge, and no juror was forced upon the defendant as an objectionable juror, there was no reversible error.

### 6.—Same—Directory Statutes—Formation of Jury.

It is the settled law of this State that the statutes with regard to the formation of the jury in capital cases are directory, and not mandatory, and where the irregularities complained of by defendant did not show any reversible error, the court correctly overruled them. Following Murray v. State, 21 Texas Crim. App., 466, and other cases.

### 7.—Same—Challenge for Cause.

Where the bills of exception to the overruling of the challenge for cause for several of the veniremen, as qualified by the court did not show any error, there was no reversible error.

### 8.—Same—Evidence—Motive—Ill-will—Matters of Inducement.

Where, upon trial of murder, neither the court nor the jury could have properly understood the case, and the facts bearing upon the immediate killing, of the motives and intent of defendant and the deceased, without being informed with respect to a certain rental contract between defendant and deceased and the various matters that arose out of it in its execution, there was no error in admitting testimony with reference to this matter.

### 9.—Same—Evidence—Map—Measurements.

Upon trial of murder, there was no error in admitting testimony that the wife of the deceased pointed out to the various witnesses on the ground the location of the parties, etc., from which the witnesses made measurements and drew a map, which was used for illustration in the trial. Following Weaver v. State, 43 Texas Crim. Rep., 340, and other cases.

### 10.—Same—Evidence—Cross-examination.

Where, upon appeal from a conviction of murder, the bill of exceptions to the cross-examination of defendant and his witnesses showed no error, the same was correctly overruled.

### 11.—Same—Self-defense—Charge of Court—Evidence.

Where, upon trial of murder, the defendant introduced evidence of threats by the deceased directed against him and his wife also, the court properly submitted defendant's self-defense and defense of his wife based on threats under such circumstances under the terms of the statute, and the general character of deceased as to whether or not he was a violent and dangerous man or a man of kind and inoffensive disposition was clearly admissible.

### 12.—Same—Rebuttal—Evidence—General Reputation.

Where, upon trial of murder, the defendant introduced evidence tending to show that deceased had been engaged in prior difficulties, and threats by deceased, there was no error in permitting the State to introduce evidence of deceased's general reputation during the time of these difficulties in rebuttal. Following Bullock v. State, 73 Texas Crim. Rep., 419.

**13.—Same—Evidence—Impeachment of Testimony.**

Where defendant, on cross-examination of the wife of the deceased, brought out her denial of certain statements that her husband was of a violent disposition and showed that she had done so, there was no error in permitting the State to rebut this testimony, and to introduce evidence tending to impeach defendant's witnesses.

**14.—Same—Charge of Court—Manslaughter—Remodeling Charge.**

Where, upon trial of murder, the issue of manslaughter was raised upon which the court charged, and submitted the same to the attorneys of the defendant, and upon their objection remodelled his charge on that subject, and also gave some requested charges of defendant, all of which were favorable to defendant, there was no reversible error.

**15.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the charge of the court not only submitted defendant's theory in killing deceased in defense of defendant's wife and also self-defense, which was authorized by the evidence, the defendant's contention that the court should not have charged on self-defense presented no error, even if the evidence had not raised self-defense, as such a charge was favorable to the defendant. Following Jones v. State, 63 Texas Crim. Rep., 394, and other cases.

**16.—Same—Evidence—Stock Law.**

Upon trial of murder, there was no error in permitting the State to introduce testimony that the stock law prohibiting mules from running at large in the county of the prosecution had been adopted and was in force, and submitting a proper charge thereon, the evidence showing that the mules of the defendant were trespassing on the leased land of the deceased and that the latter had taken possession of them under the law of impounding them, and that the defendant in attempting to recover them by force killed the deceased. Davidson, Judge, dissenting.

**17.—Same—Charge of Court—Defense of Another.**

Upon trial of murder, where the evidence showed that the difficulty grew out of the fact that the mules of the defendant were trespassing upon the crops of the deceased growing upon land which he had leased from the defendant, and there was testimony that in the attempt of defendant, his wife, and his son to forcibly take or drive from said leased premises the said mules, to which deceased objected, the latter had struck defendant's wife with a hoe, the court properly instructed the jury as requested that defendant had a right to defend his wife from said claimed assault by deceased, without reference to said stock law which was in force at the time.

**18.—Same—Requested Charges—Charge of Court.**

Where the court properly refused certain requested charges of the defendant, and others were covered by the court's main charge, there was no error.

**19.—Same—Change of Venue—Dangerous Combination of Influential Persons.**

Where, upon trial of murder, defendant in his motion for change of venue contended as one of the grounds for a change of venue the combination of influential persons preventing defendant from getting a fair trial, the evidence showed that outside of one particular locality in the county of the prosecution there was very little, if any, prejudice against the defendant, or such combination of influential persons as would prevent the defendant from getting a fair and impartial trial, there was no reversible error. Following Early v. State, 47 Texas Crim. Rep., 559, and other cases. Davidson, Judge, dissenting.

**20.—Same—Evidence—Reputation of Deceased.**

Where, upon trial of murder, the court correctly admitted testimony that the reputation of the deceased was that of a peaceable and law-abiding citizen

by showing his general reputation, there was no reversible error. Davidson, Judge, dissenting.

### 21.—Same—Rule Stated—Reputation of Deceased.

Where, upon trial of murder, defendant attempted to prove that deceased had trouble with his father-in-law in Oklahoma, etc., that he had made threats against the defendant, etc., there was no error in permitting the State to introduce evidence of the general reputation of the deceased as a peaceable and law-abiding citizen; although the examination of the witnesses with reference thereto was somewhat irregular. Following Menefee v. State, 50 Texas Crim. Rep., 249, and other cases.

### 22.—Same—Evidence—Tenant—Cropper.

Upon trial of murder, where the evidence showed that the deceased was defendant's tenant, and not simply a cropper on shares, there was no error in permitting the State to introduce testimony to show that the stock law preventing mules from running at large was in force in the county of the prosecution, and that while deceased was attempting to impound defendant's mules, which were trespassing on deceased's crops, the defendant in forcibly attempting to take the mules from the deceased killed the latter, and there was no error in the court's charge in submitting this issue to the jury. Davidson, Judge, dissenting.

### 23.—Same—Rule Stated—Tenant—Cropper.

The fact that one pays as rent part of the crop does not in itself make him a cropper, and not a tenant or leaseholder, and where one labors in the crop, owns the same and pays the owner a given portion of the crop for the use of the land as rent for the land and has possession of said land, he is not a cropper, but a tenant, and has the right of protection under the stock law preventing mules from trespassing on his crop. Davidson, Judge, dissenting.

### 24.—Same—Stock Law—Case Stated—Homestead.

Where, upon trial of murder, the evidence showed that the deceased had rented land from the defendant upon which he was making a crop; that the stock law preventing mules from running at large was in force, and that the same were trespassing on his crop, and defendant attempted to forcibly take said mules from the possession of the deceased, he was in law a trespasser, and this, although the deceased had not penned the mules at the time, but had them in his inclosure when defendant shot him, or that the said leased land was part of defendant's homestead. Davidson, Judge, dissenting.

### 25.—Same—Self-defense—Defense of Another—Charge of Court.

Where, upon trial of murder, the evidence raised the issue of self-defense and also defense of another, towit, defendant's wife, and the court submitted proper charges on these issues, applying the law to the evidence, there was no reversible error. Davidson, Judge, dissenting.

### 26.—Same—Stating Facts in Opinion.

Where the criticism of some language used in the original opinion was immaterial upon the issue of defendant's right to defend his wife and himself, there was no error.

### 27.—Same—Self-defense—Charge of Court.

Where the motion for rehearing is that the trial court erred in submitting the question of appellant's right of self-defense, independent of his right to defend against an assault made on his wife by deceased, but the evidence in the record showed that the issue of self-defense was raised, there was no reversible error. Davidson, Judge, dissenting.

Appeal from the District Court of Hunt. Tried below before the Hon. Wm. Pierson.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Sam D. Stinson* and *Crosby, Hamilton & Harrell,* for appellant.—On question of general reputation of deceased: Brownlee v. State, 13 Texas Crim. App., 255; Holsey v. State, 24 id., 35; Williams v. State, 14 id., 102; Rhea v. State, 37 id., 138; Childers v. State, 30 id., 160; Phipps v. State, 34 Texas Crim. Rep., 560; Menefee v. State, 50 id., 249; Shelton v. State, 54 id., 588; Jirou v. State, 53 id., 18; Smith v. State, 55 id., 628; Cannon v. State, 59 id., 398; Bullock v. State, 73 Texas Crim. Rep., 419, 165 S. W. Rep., 196.

On question of court's charge on stock law: Webb v. Garrett, 70 S. W. Rep., 992; Tignor v. Toney, 35 S. W. Rep., 881; Horseley v. Moss, 5 Texas Civ. App., 341; Rogers v. Frazier Bros., 108 S. W. Rep., 727; Ellis v. Bingham, 150 S. W. Rep., 602; Duke v. Railway Co., 126 S. W. Rep., 1195.

*C. C. McDonald,* Assistant Attorney General, and *Clark & Leddy,* for the State.—On question of tenant and cropper: Railroad Co. v. Bayliss, 62 Texas, 570; Harrison v. Ricks, 71 N. C., 10; Taylor v. Donahoe, 103 N. W. Rep., 1099; Hansen v. Hansen, 129 N. W. Rep., 982; Antone v. Miles, 105 S. W. Rep., 39; Ellis v. Bingham, 150 S. W. Rep., 602; 17 Am. & Eng. Ency. of Law (2nd ed.), 651; 24 Cyc., 1471.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted, tried and convicted for the murder of Harrison Choat, alleged to have been committed on June 26, 1914. The indictment was preferred July 9, 1914. The indictment is in the approved form and follows the statute. Appellant made a motion to quash it on many grounds. In submitting the case he did not urge the insufficiency of the indictment and in his brief he does not argue the question or cite any authority. We deem it unnecessary to state the various objections. The court did not err in overruling his motion. The jury fixed his penalty at twenty-five years in the penitentiary.

The killing occurred on June 26, 1914. Appellant was arrested and placed in jail at once. There are two District Courts for Hunt County,—one, the Eighth, of which Judge Pierson is presiding judge, the other the Sixty-second, of which Judge Dehoney is the presiding judge. The Eighth District Court was not in session, the Sixty-second was. There was no grand jury then in session. On June 30th Judge Dehoney entered the proper order for the summons of a grand jury to convene on July 2nd. On the latter date he duly organized the grand jury. They investigated the case, and one week later, on July 9th, preferred the indictment herein. On July 10th the court entered an order to have properly summoned 150 persons as special veniremen to try the case and set the case for trial for July 20th. On the latter

date appellant made a motion for a continuance which was granted. Thereupon Judge Dehoney transferred the case from the Sixty-second to the Eighth District. Soon thereafter appellant sued out a habeas corpus for bail, before Judge Pierson, who, after hearing the evidence, denied bail; appellant appealed, and on October 14, 1914, this court held he was entitled to bail and fixed his bond at $7500. (Ex parte Barnett, 74 Texas Crim. Rep., 136, 169 S. W. Rep., 1165.) He gave bond and was at liberty thereunder until this trial, which occurred in November, 1914, the verdict being rendered November 20th.

1. At the proper time before the trial appellant made a motion to change the venue based on both statutory grounds. (C. C. P., art. 628.) His affidavit therefor was supported by the affidavit of a large number of others. The affidavits were very brief but follow the statute, and were to the effect that there existed in Hunt County so great a prejudice against defendant that he can not obtain a fair and impartial trial in said county. And that there is a dangerous combination against him, instituted by influential persons, by reason of which he can not expect a fair trial. No fact or facts are given upon which they predicate their affidavits.

The State controverted appellant's application and affidavits. This controverting affidavit was signed and sworn to by the district attorney, the county attorney, Mr. Leddy, who was specially employed to prosecute, and three other citizens. They specifically denied each ground of appellant's motion. In addition, they swore that the said compurgators of defendant have not sufficient knowledge and acquaintance with the people throughout said county with reference to the matters contained in their said affidavits and have not sufficient information with reference to the matters in said motion, as to justify their statement that prejudice exists in said county against defendant, or that a dangerous combination of influential persons exist therein that would prevent him from obtaining a fair and impartial trial in said county; that each and all of said compurgators were wholly unacquainted with the feelings and conditions of the sentiment in said county in relation to this case, and that none of them have been over Hunt County sufficiently to form a correct idea with reference thereto and are mistaken with reference to all the matters set up and contained in their said affidavits. That said county was some forty miles square; that there were more than 6000 qualified jurors therein, a large majority of whom knew nothing with reference to the facts of the case and have no prejudice whatever against defendant; that the scene of the homicide was in the extreme southeast corner of the county; that the remaining portions were remote therefrom, were thickly settled with qualified jurors and that the communication with said portion of the county with other portions were not frequent; that a large majority of the citizens of said county had no actual knowledge of the facts and the only information a large number of the jurors had in regard to the case was based upon rumor or hearsay and that there are hundreds of qualified jurors who have no opinion whatever as to the guilt or inno-

cence of defendant; that said case created no great excitement in the county outside of the immediate community in which the homicide occurred.

The statute (art. 628, C. C. P.) prescribes that a change of venue *may* be granted on the written application of the defendant supported by his own and the affidavits of at least two credible persons, residents of the county, for either of the following causes, *"the truth and sufficiency* of which the court shall determine"*: (1) That there exists in the county so great a prejudice against him that he can not obtain a fair and impartial trial. (2) That there is a dangerous combination against him instigated by influential persons by reason of which he can not expect a fair trial.

Article 633 prescribes that the credibility of the persons making affidavit for change of venue *"or their means of knowledge,"* may be attacked by the affidavit of a credible person, and the issue thus formed shall be tried and determined by the judge and the application granted or refused as the law and the facts shall warrant.

We think it clear that the controverting affidavit of the district attorney, county attorney, and others above stated, did attack the means of knowledge of appellant and his compurgators, and unquestionably raised the issue which the statute says "shall be tried and determined by the judge." So that appellant's contention that the issue was not properly raised so as to require him to introduce evidence is not well taken. Lemons v. State, 59 Texas Crim. Rep., 299.

2. The court thereupon heard the evidence on said motion for change of venue. A large number of witnesses testified on both sides and, as is usually the case, the testimony of some would support appellant's contention, while the testimony of others would contradict it. There is a statement of facts in the bill of all this evidence. It is very voluminous. We have read and considered it all. We see no necessity for copying it, or stating it to any extent.

Mr. Branch, in his Criminal Law, section 201, states the correct rule and cites several cases so holding, thus: "Unless it is clear that the trial court has abused his judicial discretion, his action in refusing a change of venue will not require a reversal. Tubb v. State, 55 Texas Crim. Rep., 606, 117 S. W. Rep., 858; Bohannon v. State, 14 Texas Crim. App., 271; Cox v. State, 8 Texas Crim. App., 254; Grissom v. State, 8 Texas Crim. App., 386; Clampett v. State, 9 Texas Crim. App., 27; Martin v. State, 21 Texas Crim. App., 1; Magee v. State, 14 Texas Crim. App., 366; Dupree v. State, 2 Texas Crim. App., 613; Noland v. State, 3 Texas Crim. App., 598; Grissom v. State, 4 Texas Crim. App., 374."

As said by this court, through Judge Ramsey, in the Tubb case, supra: "Of necessity in respect to a question of this kind much ought to be left to the discretion and sound judgment of the court trying the case, and in no case should the judgment of conviction be set aside on account of the action of the trial court in refusing a change of venue

Vol. 76 Crim.-36.

unless it is clear that such court has abused his discretion. This is the doctrine laid down in almost the precise terms above stated by Judge Hurt in the case of Gaines v. State, 37 S. W. Rep., 331," citing some of the cases cited by Mr. Branch above, and others.

The trial judge, in approving the bill of exceptions, containing all the evidence heard on the motion for change of venue, did so with the following explanation:

"In this case a venire of 150 men was summoned to try this case. But eighty-five members of said venire were examined. Out of this number two were discharged on account of their physical condition and fifteen disqualified themselves by stating that they had conscientious scruples in regard to the infliction of death as a punishment for crime, making only sixty-eight veniremen whose qualifications were tested in order to secure a jury in this case. Out of this number twenty-six were challenged and excused by the court for cause. After the State and the defendant had exhausted their peremptory challenges, the next juror, J. M. McCombs, the last juror chosen, was not challenged for cause, said juror stating that he had formed no opinion whatever as to the guilt or innocence of the defendant. Every juror who stated that he had any opinion whatever as to the guilt or innocence of the defendant was excused by the court. Therefore, not a single objectionable juror was forced upon the defendant.

"Of the jury selected to try this case but one member lives south of a line drawn from the east line of Hunt County to the west line, passing through Greenville, the killing having occurred in the extreme southeast portion of the county and this juror lived near Quinlan in a different justice precinct from where the homicide occurred and stated upon his examination that he had not heard the facts of the case discussed and had no opinion whatever as to the guilt or innocence of the defendant. Of the jurors selected to try the case two lived north of Celeste, a town situated about ten miles north of Greenville and about thirty miles from Lone Oak. Two of the jurors lived in the Whiterock community, about ten miles from Greenville and about thirty miles from Lone Oak. Two of them lived in the Commerce community about twenty miles northeast of Greenville, and four members of the jury lived in the City of Greenville, and three of these testified that they were acquainted with the defendant and his father and had known them for some time. One juror lived near Wolfe City, about twenty miles north of Greenville and about forty miles from Lone Oak. All of the jurors accepted to try this case indicated from their examination that they were fair, impartial and unbiased jurors." Lone Oak was where the homicide occurred.

And as further said by Judge Ramsey in the Tubb case, we say of this: "After a careful inspection of the record, we do not believe that we could or would be justified, in view of the action of the trial court in conflicting evidence, in reversing the judgment on the failure of the court to grant a change of venue."

Appellant has a large number of bills of exceptions, the numbers

extending as high as seventy-one. However, some forty-two only are contained in the record. We presume appellant abandoned the others. Several of those in the record are on the same subject. It will not be necessary to take up each separately, but we will take up and discuss the questions raised by them.

3. While the jury was being selected from the special veniremen summoned, when the names of three of them were reached, it was shown that they were out as jurors upon the consideration of another case. Appellant demanded that they then be brought in and passed upon. The court refused this and required the other names on the list to be called and the trial proceeded with. However, the jury on which these jurors were engaged returned a verdict the next day and thereupon they were examined and passed upon in this case. At another time another name on the list was reached one evening; this vireman had been in attendance until a short time before his name was called. Presuming that his name would not be reached that evening, he left, but returned the next morning. The next morning the court had him called as a juror and examined and it developed that he had such physical infirmities as to render him unfit as a juror and the court excused him. To the excusing of him appellant did not object. When the name of another juror was reached on the call, because of his sickness, the court had excused him until the next morning, when he returned. He was then called, examined and challenged by the State. The court, in qualifying the bills as to these jurors showed that at the time their names were called and he declined to postpone the case until their attendance could be had, and that when they did return and were examined, the appellant had a number of peremptory challenges left. In fact, that he did not exhaust his peremptory challenges until the twelfth juror was to be selected and that he was accepted without any challenge and he and no other was forced upon appellant as an objectionable juror.

It is the settled law of this State that our statutes with regard to the formation of the jury in capital cases are directory and not mandatory. Under the many decisions of this State none of the irregularities complained of by appellant show any reversible error. Murray v. State, 21 Texas Crim. App., 466; Jackson v. State, 30 Texas Crim. App., 664; Hudson v. State, 28 Texas Crim. App., 323; Habel v. State, 28 Texas Crim. App., 588; Roberts v. State, 30 Texas Crim. App., 291; Bizzell v. State, 72 Texas Crim. Rep., 442, 162 S. W. Rep., 861. For other cases see secs. 725-726 of Judge White's Ann. C. C. P.

4. Appellant has several bills complaining that the court committed error in overruling his challenge for cause for several of the veniremen. Taking the bills together with the court's explanation and qualification, none of these show any error.

5. Appellant has several bills to the testimony of Mrs. Nora Choat, widow of the deceased, in substance telling of the rental contract between appellant and deceased and the various matters that arose out of it in its execution. Briefly stated, the evidence shows that early in

March, 1914, deceased rented a certain fenced fifteen-acre field from appellant on the halves, to be planted and cultivated in cotton. Not a great while afterwards trouble arose between appellant and deceased over the teams and tools with which deceased was to be furnished by appellant to work and cultivate the field. Deceased claimed that appellant was not furnishing these as contracted for. Appellant claimed that he was and their differences resulted in a fight a month or more before the killing. The evidence was that animosity and ill-will existed between these parties from that date until the killing and various threats, one against the other, were shown. The immediate killing occurred early in the evening of June 26, 1914. Deceased and his wife were at work in their field at this time chopping cotton. At the noon hour, while appellant and all his family were asleep, appellant's mules broke out, or jumped out of his lot into deceased's field where he and his wife were at work. The deceased sought to hold them under the stock law. The appellant first sent his sixteen-year-old son into deceased's field to get the mules. Deceased made him go back out of the field and told him to stay out, he "would take care of the mules." He went back and reported to his father. Thereupon, after consultation between appellant and his family he sent his wife and small boy, eleven years old, into the field to take the mules anyway. Appellant armed himself with a Winchester rifle and his sixteen-year-old boy armed himself with a shotgun and each followed appellant's wife and little boy, the appellant on the west of deceased's field and his sixteen-year-old boy on the east side. Before deceased notified appellant's sixteen-year-old son that he could not get the mules, deceased sent his wife to the house for a rope with which to tie them. Appellant saw deceased's wife return from her house, passing right by him, they speaking, she with the rope, going in the direction of deceased with it. When Mrs. Barnett and the little boy passed down through the field to get the mules and drive them out of deceased's field into appellant's lot, the State claimed, and had ample evidence to support its contention, that deceased followed them down where the mules were and with his hoe motioned towards the mules to keep them back and to keep Mrs. Barnett from getting them. Appellant's contention is, and there was ample evidence to support it, that deceased assaulted and attempted to strike Mrs. Barnett with the hoe and then followed her up some distance for the same purpose. The State's contention, as stated, was that deceased at no time assaulted or attempted to assault Mrs. Barnett, but that he used, and motioned with the hoe for the purpose of controlling the movements of the mules and not otherwise.

In our opinion the evidence of Mrs. Choat, objected to, was properly admissible. Neither the court, nor jury, could have properly understood the case and the facts bearing upon the immediate killing nor the motives and intent of appellant and deceased without being informed of the various matters shown by Mrs. Choat's testimony objected to. We think it unnecessary to go into a detail of these matters.

6. There are some other complaints to some other testimony of

Mrs. Choat, but as appellant's bills are explained and qualified by the court, we think none of them show error. Some of these bills to her testimony and that of some other witnesses complain of her and they, being permitted to testify that the next morning after the killing in the evening, she pointed out to these witnesses on the ground, the location of Mrs. Barnett, appellant, deceased and herself, together with the movements of the mules, and Mrs. Barnett's little boy, who was following one of the mules. From this data these witnesses made measurements and drew a map which was used for illustration and to make their testimony and the testimony in the case more intelligible and better understood by the court and jury. We think this testimony was pertinent and admissible. Weaver v. State, 43 Texas Crim. Rep., 340; Knowles v. State, 44 Texas Crim. Rep., 322; see also Pinkerton v. State, 71 Texas Crim. Rep., 195, 160 S. W. Rep., 87; Batson v. State, 38 S. W. Rep., 48; Neely v. State, 56 S. W. Rep., 625; Carter v. State, 39 Texas Crim. Rep., 345; Matthews v. Thatcher, 76 S. W. Rep., 61; St. Louis, etc., R. R. v. Alexander, 115 S. W. Rep., 648; Hart v. Railroad, 12 A. & E. An. Cas., 706, and note.

7. As qualified, appellant's bill to the court's not permitting Jimmie Barnett to answer a question, shows no error. Nor does his bill show any error to the questions asked by the State, on cross-examination of Padgitt Barnett. Neither does appellant's bill to the reintroduction by the State of the appellant himself for further cross-examination by the State, show any error. This is always permissible. Branch's Crim. Law, sec. 878, and cases cited by him.

8. Appellant introduced evidence of threats by the deceased directed against him and his wife also. The court properly submitted appellant's self-defense and defense of his wife, based on threats. Under such circumstances, under the terms of the statute (art. 1143, P. C.) and the many decisions of this court, the general character of the deceased as to whether or not he was a violent or dangerous man, or man of kind and inoffensive disposition, was clearly admissible. The appellant also introduced evidence tending to show that deceased had been engaged in difficulties in Oklahoma, where he had formerly lived. This made evidence in rebuttal by the State of his said general reputation in Oklahoma admissible. Bullock v. State, 73 Texas Crim. Rep., 419, 165 S. W. Rep., 196, and authorities there cited.

9. On cross-examination of Mrs. Choat she was asked, in substance, if she had not told appellant and other members of his family that deceased was of a violent disposition and she at one time kept him from killing her father. She denied this and they testified that she had so told them. The court, therefore, did not err in permitting her father to testify that he and deceased had never had any difference and that deceased never at any time attempted to kill him and that Mrs. Choat did not prevent him from getting a gun for that purpose. Nor did the court err in permitting the State to introduce evidence tending to impeach Sy Scott by George Dugan.

From the record it appears that when the court first prepared his

charge to the jury, it was submitted properly to appellant's attorneys. They then made various objections thereto and asked special charges. It is evident that the court recognized, or thought some of these objections, if not all of them, may have been well taken. He thereupon seems to have remodeled his charge entirely and then submitted the remodeled charge to appellant's attorneys. It also appears that they then made objections to the charge of the court as remodeled. Most of these are very general. Too much so to point out any specific error. as required by the statute.

Among other issues, manslaughter was raised. In his main charge, the court gave what we think is a correct and apt charge on that subject. However, appellant made some very general exceptions thereto, and thereupon he asked another full charge on that subject himself which the court gave, merely making an addition thereto which was applicable and in appellant's favor. It is unnecessary to copy these charges and the objections to the court's main charge. We think they are as favorable to appellant as the law and the facts justified and that there was no mistake or error therein. And none of appellant's other charges should have been given.

In a proper charge the court submitted not only appellant's defense, his claim that he killed deceased in defense of his wife, but also told the jury that if he killed deceased in defense of himself to acquit him. His objections to this portion of the court's charge were very general and point out no specific error, but he now claims that the court erred in submitting self-defense for himself. We think the evidence, without reciting it, authorized, if it did not require, the court to submit this defense in appellant's favor and that the court did not err in doing so. However, even if the evidence had not raised self-defense in appellant's favor, the court submitting such an issue would have clearly been in his favor and not against him, and it is the settled law of this State that when such is the case no reversible error is shown. C. C. P., art. 743, as amended in 1913; sec. 807, Judge White's Ann. C. C. P., and the many cases cited by him therein; Jones v. State, 63 Texas Crim. Rep., 394; Christian v. State, 71 Texas Crim. Rep., 566, 161 S. W. Rep., 101.

Over the objection of appellant, the State by proper evidence proved that the stock law prohibiting mules from running at large in Hunt County had been adopted and was in force. At the instance of the State the court gave this special charge:

"You are instructed that, at the time of said homicide, the running at large in Hunt County of mules was prohibited under the laws of this State. If, therefore, you believe from the evidence that the defendant's mules entered enclosed lands leased and occupied by Harrison Choat and were roaming about the cultivated land of the said Harrison Choat, without the consent of said Harrison Choat, then you are instructed that the said Harrison Choat had the lawful right to impound said stock and retain the same in his possession until it was determined by three disinterested freeholders appointed by the justice

of the peace of said precinct what damages, if any, had been done to the crop of the said Choat by said mules and what fees, if any, he was entitled to under the law for impounding said stock."

Appellant objected to this charge for these reasons: Because there are no facts in evidence authorizing it, it puts in issue matters and things not material for either side, there was no testimony showing that the crop of deceased had been damaged by said mules, but the uncontradicted evidence showed that no damage had been done by them, that whether the stock law was in force, or deceased had a right to take possession of said mules, was immaterial, and it required the jury to pass upon an immaterial issue to either side and was prejudicial to appellant; that it was misleading and confusing to the jury and upon the weight of the evidence and would have a tendency to limit appellant's defense and deprive him of his rights under the law, and it takes from the jury their right to pass upon whether the said stock law was in force in said county.

In this connection the court, at appellant's instance, gave his special charge as follows: "If you believe from the evidence that at the time of the shooting it appeared to the defendant, R. P. Barnett, that the deceased, Harrison Choat, was making an assault with a hoe upon the wife of the defendant or that said deceased was about to make such an assault upon the wife of the defendant, and if it appeared to the defendant that she was in immediate danger of death or serious bodily injury, then and in that event the defendant had the right to shoot and kill the deceased and defendant's right to so shoot and kill was not destroyed, abridged or limited by the fact that defendant's mules were in deceased's cotton or by any law with reference to the running at large of live stock in Hunt County."

All the testimony by both sides, without any conflict, clearly established that appellant had leased or rented to deceased the said fifteen acres fenced field, wherein the killing occurred and that the deceased at the time was lawfully in possession thereof, as such lessee, and, so far as the stock law is concerned, that deceased was the owner of said leased field. It was, during the term of the lease, deceased's homestead, and the crops raised thereon, or the crops being raised thereon, were exempt to him. (Wheatley v. Griffin, 60 Texas, 209; Moore v. Graham, 69 S. W. Rep., 200; Phillips v. Warner, 16 S. W. Rep., 423; Anheuser-Busch Brewing Assn. v. Smith, 26 S. W. Rep., 94; Allen v. Ashburn, 65 S. W. Rep., 45; Coates v. Caldwell, 71 Texas, 19, and many other authorities to the same effect.)

Appellant had no right to enter thereon and would be a trespasser if he did, the same as any other outside party would have been. The landlord has no right of entry upon the leased premises even to make needed repairs, unless the contract gives him that right. Higby v. Kirksey, 163 S. W. Rep., 315, and authorities cited. Appellant clearly recognized this and testified that after trouble arose between them and shortly before the killing said: "I told him (deceased), I says. 'Harrison, so far as your property is concerned and as far as it gives you

the liberty on my place, you are at perfect liberty to go wherever that crop gives you permission to go, otherwise, don't you go on my place any further.' And he said, 'All right.'"

The statute as to the stock law expressly provides that when it has been put in force, as was shown in this instance (R. S., 7248): "It shall be unlawful to permit to run at large within the limits designated any animal of the class mentioned in said proclamation." The law adopted in this instance expressly included mules.

The next two articles are (art. 7249): "If any stock forbidden to run at large shall enter the enclosed lands, or shall, without being herded, roam about the residence, lots or cultivated lands of any person other than the owner of such stock without his consent, in any county or subdivision in which the provisions of this chapter have become operative in the manner provided in the preceding article, the owner, *lessee or person in lawful possession of such lands* may impound such stock and detain the same until his fees and all damages occasioned by said stock are paid by him."

(7350). "No animals shall be impounded unless they have entered upon the enclosed lands or be found roaming about the residence, lots or cultivated land of another, and, whenever any stock is impounded, notice thereof shall be given to the owner, if known, and such owner shall be entitled to their possession upon payment of fees and damages."

The next article prescribes the fees allowed the taker up of such stock and authorizes and requires the justice of the peace to appoint three disinterested freeholders to assess the damages, if any, done by such stock and the fees due the taker up, if any, and makes other regulations thereabouts unnecessary to mention. As stated in said article 7250, the owner of the stock "shall be entitled to their possession upon payment of fees and damages."

There can be no question from this record but that both the appellant and his family and the deceased and his wife had this stock law in mind and were acting upon it at the time and immediately before the killing. The facts show that appellant and his family had been using the mules to haul oats in the morning of the day of the killing and wanted them again that evening for the same purpose; that at noon they turned them in the lot, watered and fed them and the appellant and his family, after dinner, all went to sleep, and slept some time. The lot wherein the mules were turned was separated from deceased's field by appellant's fence. The deceased and his wife, in passing to and fro from their house to their said field had to pass and did pass right by the appellant's house. About 1 o'clock, while appellant and his family were asleep, the deceased and his wife, taking their two little infant children, went to their said field to chop cotton and did engage in chopping their cotton. They were somewhat below the center of their field. While they were thus at work and appellant and his family asleep, appellant's three mules jumped over said fence out of the lot into deceased's field. They began grazing therein, going south towards deceased and his wife, who saw them. Mrs. Choat testified: "When

I saw these three mules in the field I hoed on a while and went to the house after a rope; I hoed something like forty minutes after seeing the mules in the field and then went home and over to Mr. McFadden's. In going I went up to the lane, crossed in the lane where I got in the field at the time and went up in front of Mr. Barnett's house." She then shows that she went to her house, got a rope for her husband to tie the mules and went back to take it to him for that purpose. She said that Padgitt Barnett did not come down in the field after the mules while she was there. Padgitt said she was there at the time. According to her testimony Padgitt went down in the field after the mules while she was gone to her home after the rope. At any rate, after appellant and his family woke up, they discovered his three mules in deceased's field about two-thirds of the way down in the field. Appellant sent his sixteen-year-old son Padgitt down into deceased's field to get the mules. Padgitt testified: "In going towards the mules I had to pass pretty tolerably close to Mr. Choat, and he told me if I was going down after the mules I could turn around and go back, them mules were in the field and they were going to stay there, and I turned around and went on back to the house." At another place he said: "Mr. Choat spoke to me about like he always talks and told me he would not let me take the mules and I went back and reported to my father." Appellant himself swore that Padgitt came back and so reported to him. He said that Padgitt said to him, "Mr. Choat made him come back out of the field and told him if he was going back down in the field after the mules to go back and stay out, he would take care of the mules." Just after Padgitt so reported appellant had a consultation with his wife and his sons Padgitt and Jimmie, and they all said, in substance, that appellant first said he was going down himself and get the mules; that his wife told him that he had better not go, that he might have trouble, and thereupon, upon further consultation, it was determined that Mrs. Barnett and Jimmie, her little eleven-year-old boy, should go down in the field and get the mules, and that they then started out to do so. Immediately after she and Jimmie started appellant armed himself with a Winchester rifle and his son Padgitt armed himself with a shotgun. Padgitt took the east side of the field, fenced, and followed on down to about opposite where the killing occurred. Appellant went out with his rifle, first stopped on the north string of the fence about the northwest corner. He saw Mrs. Choat passing along with the rope with which deceased was going to tie the mules. They spoke to one another. He said nothing to her about the mules or that his wife and Jimmie were going down after them. Mrs. Choat proceeded on down with the rope towards her husband. Appellant got over in his cornfield on the west string of the fence just outside of the deceased's field and followed along with his rifle till he got some distance, but not quite opposite to where the killing occurred. When Mrs. Barnett and Jimmie got down to about where deceased was, she said she said nothing whatever to him. She was after the mules. The mules then were down about the south string

of the fence. Both deceased and Mrs. Barnett and Jimmie started after the mules and they all followed them down to about the southeast corner of deceased's field. The State's theory, and there was ample evidence to sustain it, was that Mrs. Barnett and Jimmie attempted to run the mules from the southeast corner of deceased's field along his east line north, so as to run them into appellant's lot; that the deceased attempted to prevent this and hold the mules, and in doing so, raised his hoe and motioned at the mules to prevent their going north. However, one of the mules got by, went along the east string followed by Jimmie. The other two turned and went back west along the south string of the fence, Mrs. Barnett following along to run the mules out, deceased to prevent this and catch the mules. The evidence on behalf of the State strongly tends to show that at no time did deceased attempt to strike Mrs. Barnett with the hoe, and that at no time was he in such proximity to her that he could do so. On the other hand, Mrs. Barnett claimed that deceased struck at her with the hoe when they were at the southeast corner of the field, and not at the mules. The testimony by the State shows that when the two, deceased and Mrs. Barnett, were following the mules west along the south string, deceased was in front and ahead of Mrs. Barnett and that he was after the mules,—not Mrs. Barnett. The testimony on the appellant's side was that Mrs. Barnett was in front and deceased following her with the hoe. This disputed point was for the jury to solve. But unquestionably the theory was clearly presented that deceased was seeking to hold the mules to impound them, and prevent Mrs. Barnett and Jimmie from taking them from his possession and driving them out of the field. Appellant and Mrs. Barnett both testified that before she and Jimmie started down from the house into the field to get the mules that she asked appellant if the deceased had the right to hold them. Appellant told her that he did not have, but that in effect he might be liable for the damage his mules had done deceased, and if so, he would pay it, clearly showing that they all specifically had in mind at the time the stock law and their rights under it. So that it was very important for the court to tell them, as he did, the rights of the deceased under the stock law.

Our civil courts have repeatedly discussed and decided the effect of the said stock law. In Graves v. Rudd, 65 S. W. Rep., 63, it was shown that appellant therein sued to recover his twelve head of cattle and sequestered them. Appellee therein held them and claimed damages and fees under said stock law. The court rendered judgment in favor of appellee for $2 damages and $24 fees and costs. The owner of the cattle appealed from that judgment and, among other things, claimed that the stock law had no application because his cattle were in a field which was enclosed by a good fence and escaped therefrom without fault on his part. The court, after quoting said article 7249, Revised Statutes, said: "The stock in question did enter the enclosed field of the defendant after the adoption of the stock law by Grayson County, forbidding said stock to run at large; and defendant, acting under the statute, proceeded to impound the cattle. The cattle were trespassing

upon the cultivated land of defendant at the time that he took the same ino his possession. Under the act he was authorized to impound the cattle, and to hold the same until his fees and damages were paid as provided by the terms of said act," and affirmed the case. The Supreme Court denied a writ of error therein.

In Frazer v. Bedford, 66 S. W. Rep., 573, it was shown that some cattle belonging to Bedford and others escaped from a pen in which they were confined and broke into the enclosed premises of appellant and damaged his crop. The stock law was in force. Without impounding the stock he sued Bedford et al. for damages. The trial court instructed the jury that if the defendants used such care as an ordinarily prudent man would and should have used, under the circumstances, to prevent the cattle from escaping and entering upon the enclosed land of the plaintiff and his enclosed crop, then they should find for the defendants. The plaintiff requested a charge, which was refused, to the effect that it was the duty of the defendants to keep their cattle confined so .as to keep them from escaping and entering his enclosed land and damaging his crop, and if they failed to do so, the jury should find for him. Under the instructions the jury found for the defendants therein. Plaintiff therein appealed and the Court of Civil Appeals held that in a territory in which the stock law had been adopted the land owner (in this case the deceased), was guilty of no fault or negligence in failing to fence against the animals which are forbidden to roam the country at will, saying: "The owners of such stock must keep the same confined at their peril, else they will be held liable to account for the damages which may be inflicted on their neighbors by such animals. Since they have control of the agency by which the damage is occasioned, it is more consistent with reason and justice that they should suffer than should their neighbors, who have no means whatever of preventing the injury, except by going to the expense of fencing against such animals, to require which would defeat the purposes of the law."

In Evans v. Railroad, 37 S. W. Rep., 93, it was shown that the stock law was in force in the city limits of Greenville. Evans' mare had been staked close to the railroad but broke the rope and was afterwards killed in Greenville by the railroad train. No actual negligence of the railroad was shown. Evans sued the railroad for the value of the mare. The court held that the railroad company should not be required to fence against animals which the law said should not run at large; and, further: "The fact that the owner of the animal was not at fault in permitting it to wander upon the track does not increase the burden or responsibility of the railway company, and make it liable, except in the way just stated,"—that is, by showing actual negligent killing. "The caution of the owner does not, in a case of this kind, have the effect of increasing the care of the railway company, and burdening it with an extra duty in the premises," and the court affirmed the case denying plaintiff a recovery.

In Red River, etc., R. R. v. Dooley, 80 S. W. Rep., 566, Dooley sued

the railroad to recover $250 for killing two horses belonging to him, and recovered. The stock law was in force in Denton County, where these horses were killed. The Court of Civil Appeals reversed the case, holding that where the stock law was in force, "the animals are trespassers and their bare presence is negligence on the part of the owner," citing many cases. And further saying: "We do not agree with appellee in his contention that the animals in question being at large without his knowledge would alter the rule as above announced. Under the terms of the stock law in force in Denton County (R. S., art. 7248); it is declared to be 'unlawful to permit to run at large' within said county any animals of the class to which appellee's belonged. This we construe to mean that it is the duty of the owner of such animals to prevent their running at large, and not merely that he is forbidden to knowingly permit their freedom."

In the City of Paris v. Hale, 35 S. W. Rep., 333, the stock law was shown to be in force in the City of Paris by proper ordinance. Hale kept his horse in his lot adjoining one of the public streets and it had never before then escaped therefrom. He did not permit it to run loose on the streets. His lot and the gates thereto were always kept fastened. About an hour or hour and a half before the horse was taken up by the stock policeman the horse in some way broke out or got out of the lot into the street. Hale used due care to keep his horse in his lot, but he got out without his fault or negligence. The police officer, however, found the horse on the street and took him to the pound. As soon as Hale found it out he demanded possession, which the officer refused to surrender, unless he paid the pound fee of $1. This Hale refused to do and sued for his horse. The trial court held that as Hale had exercised reasonable care to restrain his horse and it escaped into the street without his consent or fault, that his horse was not running at large within the meaning of the ordinance and entered judgment for the horse. The horse was not shown to have caused any damage whatever,—merely loose in the street. The Court of Civil Appeals held that the City of Paris had the right, as a police regulation, to provide that when an animal was thus found in the streets loose and uncontrolled, that it should be impounded and the owner was not entitled thereto until he paid the impound fee, the court saying: "It is evident that the ordinance was intended to prevent some real or supposed evil, and the remedy provided was intended to apply whenever the evil recurred, regardless of any purpose or want of purpose on the part of the owner of the animal, because the harm resulting from the animal being loose would be the same whether the owner was or was not in fault," and the court reversed and rendered the case.

In this case the deceased, we think, unquestionably had the right and was undertaking to exercise it, to hold appellant's mules for the fees and damages, if any. The law prescribed how appellant could peaceably get possession of his stock and that three disinterested freeholders should determine what damages and costs, if any, the deceased was entitled to. If none, appellant would have procured his stock without any cost.

If they had caused damage, or deceased had been entitled to any fees, by paying it appellant could have peaceably procured his stock. He did not attempt to do anything of the kind, but he took the law in his own hands and undertook by using his wife and little boy to forcibly take the stock out of deceased's possession, and for that purpose sent them to get the stock and he and his sixteen-year-old boy armed themselves with guns and followed at a safe distance, intending as he did from the State's standpoint, to shoot down and kill the deceased if he interfered with his wife in her attempt to forcibly take the stock out of the deceased's possession. He was a trespasser and in the wrong from start to finish. The court did not so tell the jury, however, but the special charge objected to merely told them that the deceased had the right under the stock law to hold the possession of the stock until three disinterested freeholders should determine whether or not he was entitled to any fees and damages. We think the court did right in so telling the jury. As shown by appellant's special charge, copied above, the court told the jury that appellant's right to defend his wife from the claimed assault by deceased upon her was not destroyed, abridged or limited by the fact that his mules were in deceased's cotton or by any law with reference to the running at large of live stock in Hunt County. In our opinion it was proper for the State to prove that the stock law was in force and it was necessary under the facts and circumstances of this case that the court should also tell the jury as he did in said special charge objected to.

If, under the circumstances, Choat had killed Mrs. Barnett and he had been on trial therefor, we think there can be no question but that it would have been the duty of the court to have told the jury that Choat had the right to impound said stock and to prevent their being taken out of his possession, as they were attempted to be done by Mrs. Barnett and appellant. However, as appellant killed Choat, the State had the right to have the court tell the jury in this case what Choat's rights were with reference to this stock, which, without doubt, he was attempting to enforce and appellant knew it.

The court properly refused all of appellant's special charges which he did refuse. Wherever necessary or proper to submit any question sought to be raised thereby the court covered the point fully and aptly in his main charge.

In our opinion no reversible error is pointed out and the judgment will be affirmed.

*Affirmed.*

DAVIDSON, JUDGE.—1. I believe the venue should have been changed. 2. Also the court's charge is erroneous in regard to deceased's right of impounding the mules. 3. There are some other questions I am inclined to think erroneous to require reversal. I have not had time to examine those questions critically, however, but I am persuaded this judgment ought to be reversed.

ON REHEARING.

May 12, 1915.

HARPER, Judge.—In this case appellant has filed a motion for rehearing in which he earnestly insists that the court erred in holding that the court below committed no error in overruling his application for a change of venue; second, that the court erred in admitting certain evidence as to the reputation of deceased being a peaceable and law-abiding citizen; third, that the court erred in permitting evidence to be introduced showing that the stock law was in force, and in the charge given to the jury on this issue, and, fourth, that the court erred in submitting the issue of appellant's right to defend against danger or apparent danger to himself, insisting that the evidence presents no such issue.

While not waiving the other questions in the case, these are the only ones insisted on by appellant's counsel, and they have filed an able and exhaustive brief thereon, as have also counsel for the State. At the request of Presiding Judge Prendergast we have taken the record, and the briefs filed and studied them carefully in regard to the questions thus presented.

In his motion presenting the question of change of venue appellant says this court in its opinion says: "A large number of witnesses testified for both sides, and, as is usually the case, the testimony of some would support appellant's contention, while the testimony of others would contradict it." He then insists that the court did not pass on the second statutory ground, "that there is a dangerous combination against appellant, instigated by influential persons, by which he can not expect a fair trial." The court in its original opinion discussed the question generally, without taking up each of the grounds separately, but considered both grounds in passing on the question.

Now what facts does appellant rely on to show a dangerous combination against him, which would prevent him from getting a fair trial? The testimony on the change of venue would show that some time prior to the homicide appellant had killed another man in the same community (Lone Oak); that he was tried and acquitted; that when this homicide occurred some eighteen or twenty citizens of the Lone Oak community went to Greenville, the county seat, and requested the court to empanel a grand jury to investigate this case, and if a bill was found, to try appellant at that term of court. The record discloses that Lone Oak is in the extreme southeastern portion of the county, twenty miles from Greenville. While it is not shown that these men used any harsh language towards appellant at the time they talked with the judge, yet it should be conceded that these men would not make fair and impartial jurors, owing to the interest they were taking in seeing that the case was promptly investigated. Appellant was indicted, and the cause set for hearing at that term. When it was called for trial appellant's motion for a continuance was granted. It is shown that Mr. Neyland, who was then district attorney, was

attorney for appellant in his former homicide trial, as was also his brother. When appellant killed deceased the district attorney's brother was called by appellant to confer with him, and he went to Lone Oak the day of the homicide. After the case was continued there was something said by some citizen or citizens of Lone Oak about the case being continued which might be said to reflect on the district attorney and his brother. The district attorney called a meeting of the citizens of Lone Oak community, some sixty attending, and addressed them, explaining that he opposed the continuance, suggesting the employment of counsel to prosecute the case in connection with him. On this suggestion Mr. Johnson passed around a subscription list in the Lone Oak community and raised funds to employ Clark & Leddy to prosecute the case in connection with the district attorney. It is not shown, nor even suggested, that any man outside of the Lone Oak community contributed to this fund or was solicited to do so. This is the full extent of a combination shown, if it shows a combination. If it was shown by the record that the same condition existed all over the county, or any considerable portion thereof, as it existed in the Lone Oak precinct, the change of venue should have been granted. But the record discloses that Hunt County contains some 9000 voters, and at least 6000 qualified jurors, and Lone Oak precinct embraces only a very small per cent of that number, only 370 votes. The Campbell community is in the Lone Oak precinct, and near to Lone Oak, and the same condition may be said to have existed at Campbell, although it is shown that appellant had many friends at Campbell who signed his application for a change of venue, and who testified in his behalf on this hearing. But what do the witnesses for appellant say about a "combination of influential citizens"?

O. E. Branch testified: "No, sir, I do not know of any combination of influential citizens organized in any way that would prevent the defendant from getting a fair and impartial trial."

D. M. Finley testified: "I don't know that there is a combination against Mr. Barnett, instigated by influential persons by reason of which he can not get a fair trial. Where we got that from was Lone Oak. I understood that one day a crowd from Lone Oak came here to demand a trial."

W. J. Wheeler testified that while he signed the affidavit for a change of venue, that he did not mean to say that he knew of a dangerous combination of influential persons—that he based it on reports that had come to him that counsel had been employed to prosecute by some citizens of Lone Oak.

W. O. Dunbar testified that he was a friend to Mr. Barnett (Sr.) and had been his friend for a number of years; that he did not know of any combination of influential people combined against the defendant to prevent him getting a fair trial. That the allegation was based on the fact that some citizens of Lone Oak had gone to Greenville to demand an investigation and trial, and it was his opinion this might create a prejudice.

Mr. W. E. Harris testified: "I don't know of any combination of influential citizens that have combined against Mr. Barnett to prevent him getting a fair trial."

These were all witnesses introduced by appellant, and we might continue such excerpts but do not deem it necessary, for the testimony of each and every one of them shows that the only facts they had to sustain such an allegation was as hereinbefore stated, that some eighteen or twenty citizens of the Lone Oak community had gone to the district judge and asked that he empanel a grand jury and try appellant at that term of the court, and the further fact that a subscription list had been circulated in Lone Oak community to raise funds to employ Clark & Leddy to prosecute the case. In addition to this a few witnesses stated that they had heard a rumor that if he was not promptly tried there might be mob violence, yet the record shows that the case was continued, appellant gave bond, returned to the Lone Oak community, and remained there until this trial was had, and there was no sign or suggestion of mob violence.

In the case of Earles v. State, 47 Texas Crim. Rep., 559, this court held: "If the evidence shows that outside of one particular locality there is very little, if any, prejudice against defendant, the decision of the judge refusing the change of venue will be sustained."

In the case of Renfro v. State, 42 Texas Crim. Rep., 393, a portion of the testimony is recited, and we think makes a stronger showing than was made in this case, and after reciting the testimony, the court says: "We do not think that the facts as above detailed show that appellant could not get a fair and impartial trial, under the laws and Constitution of this State, in Johnson County at the time of this trial. The evidence discloses that whatever prejudice there might have been, as far as the record shows, was confined to the northeastern part of the county. The county contains 9000 voters, and the witnesses who testified for appellant are nearly all from the northeastern part of the county, where the parties to the tragedy had formerly lived. Some of the witnesses introduced by appellant himself stated that they would not swear that a fair and impartial jury could not be selected in the immediate vicinity where the killing occurred. We find nothing in this bill of exceptions to indicate that there exists any combination of people or any prejudice in Johnson County such as would likely deprive appellant of a trial fair and impartial, according to the laws and Constitution of this State."

As shown by the evidence in this case, Hunt County contains 9000 voters; only 370 of them live in the Lone Oak precinct, and whatever of prejudice there is against appellant is confined to the Campbell and Lone Oak communities in said precinct in the southeastern portion of the county, and when we consider the record as a whole that is now before us, it discloses that it was not only possible to obtain a jury in the way they are selected which would be without prejudice, but in fact one was selected out of a venire of less than one hundred men. As we read the record there is nothing to indicate that the case had

been prejudged by the citizenship of Hunt County, nor that there was any prejudice against appellant except in the locality where the offense was committed, and the evidence offered by appellant (excluding that offered by the State) shows there was no dangerous combination against him instigated by influential persons such as would prevent him getting a fair trial. Applications for a change of venue are confided to the discretion of the trial judge, and that discretion should not be interfered with on appeal unless the record discloses it has been abused or arbitrarily exercised to the prejudice of the accused. Noland v. State, 3 Texas Crim. App., 598; Grissom v. State, 4 Texas Crim. App., 374; Labbaite v. State, 6 Texas Crim. App., 257; Daugherty v. State, 7 Texas Crim. App., 480; Cox v. State, 8 Texas Crim. App., 254; Bohannon v. State, 14 Texas Crim. App., 271; Martin v. State, 21 Texas Crim. App., 1; Lacy v. State, 30 Texas Crim. App., 119. And whenever the facts show that whatever prejudice existed was confined to a single section of the county, there is no error in refusing the application. Harrison v. State, 43 S. W. Rep., 1002.

Appellant's next contention is, that while this court perhaps correctly held that evidence was admissible that the reputation of deceased was that of a peaceable and law-abiding citizen, but he insists that in admitting this testimony the court admitted evidence which is inadmissible on this issue. He specially cites the testimony of J. T. Stewart. The entire bill is:

"Be it remembered that upon the trial of the above entitled and numbered cause, and while the State's witness J. T. Stewart was on the witness stand, and being examined by State's counsel in chief, the following questions were asked with the following objections and answers thereto, towit: Q. State if you know whether or not the deceased was a man of violent and dangerous character, or a man of kind and inoffensive disposition, and whether he was such a person as was calculated to carry into execution a threat made. Counsel for defendant: We object to that, because it is leading, a conclusion of the witness, immaterial and irrelevant and no proper predicate for the introduction, and not in rebuttal to anything. Q. State, if you know, his general reputation as being a violent character, or a man of an inoffensive disposition. Counsel for defendant: We object, because it is immaterial and irrelevant, and no proper predicate laid for the introduction, and calls for an opinion and conclusion of the witness, not in rebuttal to anything offered by us, and does not state whether in Halifax, Texas or in Missouri, and could not have been known to the defendant. Court: Overruled. Defendant excepts. Q. Do you know whether he was a man of violent and dangerous character, or whether a man of kind and inoffensive disposition? Counsel for defendant: Same objections to that. Overruled by the court. Defendant excepted. Q. Do you know? A. Yes, I know. Q. State what it was. Counsel for defendant: Same objections to that. Court: Overruled. Defendant excepted. A. He was of a peaceable character, I never knew of him having any

Vol. 76 Crim.-37.

trouble.  Q.  You say he was peaceable?  A.  Yes, sir.  Counsel for defendant:  We raise the same objection to that, and move to strike it out.  Court:  Overruled.  Defendant excepted.  Q.  Then state whether or not he was of a kind and inoffensive disposition.  Counsel for defendant:  We object to that as leading, and the other objections, too.  Q.  General reputation?  A.  He was.  Counsel for defendant:  We except.  To all of which action and ruling of the court defendant then and there in open court excepted, and here tenders this his bill of exception, and asks that the same be examined, approved and filed as a part of the record of this cause.

Sam D. Stinson,<br>
Crosby, Hamilton & Harrell,<br>
Attorneys for Defendant.

"Examined, approved and ordered filed as a part of the record in this cause with this explanation:  There was no objection that the questions asked .or the answers made were not the proper way to prove general reputation; no motion to exclude any answer on that ground, and I understood the question to refer to general reputation and it appeared that the parties so understood them.

Wm. Pierson,<br>
Judge, 8th Dist."

It is thus seen that on the trial of the case the contention made by appellant was that the State had no right to prove the general reputation of deceased in the respect mentioned.  The record discloses that before the questions propounded were objected to Mr. Stewart had testified:  "I live at Sobel, Oklahoma; I am 44 years old.  I am an uncle to Harrison Choate (deceased).  I remember Harrison Choate coming to Texas.  I have known Harrison Choate ever since he was born.  He has worked for me, mostly in stave making—timber work.  He was working for me mostly four or five years in the stave business; the places he worked at were Ruth, Coreen, Soencerville, Soba, and Lukefodder, I believe that was all the places he worked for me in the timber business as well as I remember—no, he worked for me in Texas, too."  Appellant had introduced evidence tending to show that deceased had made threats against him.  By Mr. Kennerly, that he had heard deceased say, "By God, if appellant did not come across, the trouble between them had not begun."  By Clyde Willis, that deceased had said: "That appellant was trying to run him off the place—that he would scrap the great big son-of-a-bitch every morning before breakfast before he would let him run him off."  By C. M. Scott, that he heard deceased say, "That if appellant did not stay out of his business he would get up in his wool."  By Sam Branch, that deceased had been practicing with his pistol.  By Grady Barnes, that he had seen deceased cleaning a rifle, and from his acts and conduct he was led to go and tell appellant about it, and tell him "that he had better be careful, if he did not deceased was liable to get the drop on and kill him some time."  By

Wylie Smith, that deceased had told him "he could make more money whipping appellant than he could making a crop." Appellant attempted to prove that deceased had trouble with his father-in-law in Oklahoma, and would have killed him if his wife had not gotten the gun away from him, and introduced witnesses who testified that deceased's wife had so told them. Also evidence tending to show that deceased had had other difficulties in Oklahoma, and then got on the stand himself and testified to having heard these matters; that deceased had made threats, and the threats were communicated to him. After the introduction of this testimony by appellant, then proof of the general reputation of deceased was admissible as a peaceable and law-abiding citizen, and the court did not err in admitting it. While in the above bill it may be said that the questions do not follow the stereotyped form, "Do you know his general reputation in the community where he lived?" in the respect mentioned, yet the whole testimony and examination shows that the witness was testifying as to his reputation in the community where he had lived, and while the questions propounded and examination were perhaps a little irregular, yet as no testimony was brought out other than that deceased's general reputation was that of a peaceable, law-abiding citizen, and the irregularity was doubtless brought by the continued objections of appellant after the court had ruled that deceased's general reputation was admissible, the bill presents no error. When the person on trial introduces testimony that deceased had made threats, then evidence of general reputation is admissible. In Menefee v. State, 50 Texas Crim. Rep., 250, it is said if the defendant introduces evidence of communicated threats, it is not error for the State to introduce proof of good character for peace. See also Rhea v. State, 37 Texas Crim. Rep., 138; Cornelius v. State, 54 Texas Crim. Rep., 173; Jirou v. State, 53 Texas Crim. Rep., 18. The witness qualified to prove general reputation when asked if he knew, and answered, "Yes, I know it."

The next objection appellant makes is that the court erred in admitting evidence to show that the stock law was in force in the territory where the mules got out and went into the field being cultivated by deceased. This question was so thoroughly discussed in the original opinion we would not deem it necessary to do so again only that appellant now makes a contention that deceased was not a tenant but a "cropper," and being a cropper, had no estate in the land. If this were true, of course it would put an entirely different phase upon that issue. If appellant was in actual possession of the land, and deceased had no possession, then the court's charge on that issue would be erroneous. But does the evidence in this case even suggest that appellant was in possession of the land being cultivated by deceased? The fact that it may be a part of his homestead does not raise such an issue, for farmers very often rent a part or all of their homestead farm to tenants for a year, and under the law the tenant during that year is in possession of the farm, and if he in fact is a tenant, and not what is termed a cropper. Nor does the fact that one pays as rent part of the crop in

and of itself make one a cropper and not a tenant or lease holder, whether he pays the third and fourth, or one-half the crop. If it is the landlord's crop and he pays the one who does the labor in the crop a part of the crop in payment for his services, then the laborer is not a lease holder or tenant, but is what is termed a cropper. If, however, the one who labors in the crop *owns the crop and pays the owner a given portion of the crop for the use of the land* for the year as rent for the land, and has possession of the land, he is not a cropper but a tenant, and has a lease hold interest in the land. This is statutory in this State. Article 5475, Revised Statutes, reads: "All persons leasing or renting lands at will or for a term shall have a preference lien upon the property of the tenant hereinafter indicated upon such premises for any rent that may become due . . . whether the same is to be paid in money, agricultural products or other property." If the crop was the property of the owner of the soil he would and could have no lien. It is true that under our decisions where the rental is for one-half of the crop it has been held that upon the maturity of the crop the owner of the land becomes and is the owner of one-half of the crop raised on the rented premises, and may sue for it as owner and not lien holder, but he is held to be only a lien holder on the tenant's half of the crop for such supplies as he may have furnished, and if he has furnished no supplies, the other half of the crop is the property of the tenant to do with as he wills in so far as the owner of the soil is concerned. On the other hand, if the trade is that he is to pay the man who works one-half the crop raised as wages, the landlord would own the entire crop, and the person who worked the crop would be entitled to one-half as wages, and for which he might have a cause of action if the landlord refused to pay it. That well-known text writer on land law, Mr. Tiffany, in his work on "Landlord and Tenant," well says in section 10: " 'Cropper' distinguished from tenant: Where the owner of land makes a contract with another whereby the latter is to cultivate the land and the crops produced are to be divided between the two parties in a certain proportion, the relation of landlord and tenant may or may not result. The question of whether it does result is one of intention, to be determined upon a construction of the whole instrument if the contract is in writing, or from the language used by the parties and their acts in carrying out the contract if the agreement is oral. The various considerations which may operate in this connection, and the perplexing questions which may arise under such an agreement as to the ownership of the crops pending their division, will be reserved for future discussion, and it is desired in this place merely to point out that the principle that only a tenant has possession and that an occupant in another capacity has not possession applies in this case as in others. That is, if the agreement involves a lease, making the cultivator of the land a tenant, he has the possession, while if it is a mere 'cropping contract,' the possession remains in the owner. And, conversely, if the agreement shows an intention that the possession or the 'exclusive possession,' as it is frequently expressed, shall remain in

the land owner, it does not constitute a lease making the cultivator a tenant, while if it shows an intention that the cultivator shall have the possession or 'exclusive possession,' he is necessarily a tenant. In one or two cases the court refers to this right of possession as one of several considerations on the question of the relation of the parties, but, it is submitted, if their intention in this regard is clearly established, it must necessarily be conclusive as to the relation."

Now what does the evidence in this case show? Appellant himself testifies: "The agreement was that I (appellant) was to furnish the necessary team and tools to work the crop, the feed to feed the team, and he (deceased) was to give me half the crop *delivered at the gin.*" He further says that later on he (appellant) arranged to *let deceased have more land* than he at first let him have. He furthermore testifies that he later talked to the justice of the peace "in regard to deceased trespassing on his place with the exception of where he had *rented,*" and that thereafter when some trouble arose appellant says he told deceased, "Harrison, so far as *your crop is* concerned and as far as it gives you liberty on my place you are at perfect liberty to go wherever that crop gives you permission to go, but otherwise don't you go on my place any further." Many similar expressions can be found in appellant's testimony, all showing that his construction of that contract was that he had rented the land to deceased. In fact, no issue appears to have been made in the trial court, but it seems to have been conceded that deceased was a tenant in possession of the land, and the contention that he was merely a "cropper" and had no interest in the land is raised for the first time in the motion for rehearing in this court. All the witnesses so testify. Padgitt Barnett, a son of appellant, testified: "There was a rental contract by which Mr. Choate, deceased, was to rent the land. I heard part of the terms of the contract."

R. R. Neyland, an attorney, testifies: "Bob Barnett (appellant) counseled with me concerning a man that was living on his place by the name of Harrison Choate; he was to see me in reference to *rental contract* that he claimed he had with Mr. Choate."

Mrs. Choate testified: "We (herself and husband, deceased) went to Bob Barnett's house and stayed there two weeks and then went to keeping house on his place. My husband had arranged to rent some land from Bob Barnett. I heard Bob (the defendant) say what the contract was before Harrison (the deceased) . . . I think there was about thirty acres of land my husband rented."

Under this state of facts none of the authorities cited by appellant bear out the contention now made that deceased was a cropper and not a tenant and had no lease hold interest in the land. Instead the above evidence being uncontradicted and unquestioned on the trial, there can be no question but that deceased was a tenant in possession of the land he was cultivating. But it may be insisted that deceased had not penned the mules. The record discloses that when deceased and his wife went back to their field they found the mules in this enclosure. After working some forty minutes deceased sent his wife

back to their home after some ropes to catch and rope the mules.
While she was gone Padgitt Barnett, the oldest son of appellant, went
down into this field after the mules. Deceased refused to let him have
them. Morally, it might be said under this record, deceased did wrong,
but legally he committed no wrong to hold stock that had got into an
enclosure under his control for that year, the stock law being in force
in that territory. Appellant knowing that his stock had gotten into
an enclosure under the control of and in possession of deceased, had
no right to attempt to take them by force. Even if deceased had no
legal right to hold them, the stock being in his enclosure, the law does
not sanction the use of force by appellant to regain possession of his
stock. He had attempted to do so peaceably by sending his son after
them; deceased declined to let him have them. Appellant then sends
his wife and younger son after the stock, he taking a gun, getting on
one side of the field, and his older son takes another gun, and gets on
the other side of the field. For what purpose did appellant and his
son take their guns and get on opposite sides of a fifteen-acre field
while Mrs. Barnett went into the field? If, as appellant contends, it
was to protect his wife and see that deceased offered his wife no insult
or violence as contended by him, they did no legal wrong in taking
their guns, and the court so instructs the jury, giving the special
charge requested by defendant, reading as follows:

"You are further instructed that homicide is justified by law when
committed in the defense of another person against any unlawful and
violent attack made in such manner as to produce a reasonable expecta-
tion or fear of death, or serious bodily injury to such party, and it is
not essential that the danger should, in fact, exist. It may be only
apparent and not real. If it reasonably appears from the circum-
stances of the case that danger existed, the person acting upon such
apparent danger has the same right to defend against it and to the
same extent that he would have were the danger real; and in deter-
mining whether there was reason to believe that danger did exist, the
appearances must be viewed from the standpoint of the person who
acted upon them.

"Now, if the defendant's wife, together with her little boy, went
down into the field for the purpose of driving out the mules of defend-
ant, and the deceased, Harrison Choate, with a hoe in his hands, fol-
lowed after them and that the mules of defendant commenced running
across the field, and the wife of the defendant started rapidly in pur-
suit of them, and the deceased, Harrison Choate, following her with
a hoe in his hand, and from the acts of said Harrison Choate, if any,
or from his words, coupled with his acts, if any, there was created in
the mind of the defendant a reasonable apprehension that his wife was
in danger of losing her life, or of suffering serious bodily harm at the
hands of the said Harrison Choate, then the defendant had the right
to defend her from such danger or apparent danger, as it reasonably
appeared to him at the time, viewed from his standpoint.

"If, therefore, you believe from the evidence that defendant, in Hunt

County, Texas, on or about June 26, A. D. 1914, did kill Harrison Choate by shooting him with a gun, believing at the time he did so that his wife was in danger of losing her life, or of suffering serious bodily harm at the hands of the said Harrison Choate, then, in that event, you will find the defendant not guilty, and so say by your verdict."

On the other hand, if as contended by the State, appellant took his gun and went to one side of the field, with the intention of taking the stock by force, and if deceased interfered with his wife in attempting to drive them out, to shoot and kill him, appellant did wrong. And if, after appellant took the gun out there, and Choat, as contended by the State, only endeavored to keep the mules and prevent appellant's wife from driving them out of the enclosure, and because he (Choat) did attempt to do so, he shot and killed deceased, he would be guilty of an unlawful homicide, and as the court submitted both murder and manslaughter, and the jury finds appellant guilty of murder, the evidence showing that ill-will existed between appellant and deceased; that he had been informed that Choat would not peaceably surrender the mules, and with this knowledge had permitted his wife and younger son to go after the mules without saying anything to Choat, and further showing that when they went, he armed himself with a deadly weapon, stationed himself where he could watch the parties, and when Choat either attempted to keep the mules from being driven out, or made an attack on his wife, appellant rushed in and shot deceased, we believe the jury would be authorized to find him guilty of murder, as they had necessarily found that Choat did not make an attack on his wife under the charge given by the court. And the physical facts on the ground sustain this contention, for they would show that deceased was some thirty feet in front of Mrs. Barnett and had never been nearer her than this; was armed with no weapon other than a hoe, and one could hardly assault another with a hoe, thirty feet distant, by striking at such person.

The criticism of some language used in the original opinion as to where appellant got over the fence and the direction he went, need not be discussed. It would be immaterial where he got over the fence, as the testimony and all the testimony, shows that when he did get over he went in the direction of Choat and shot and killed him. The only material issue at this point is, whether or not Choat was attacking the wife of appellant, or whether by his acts and conduct he led appellant to believe his life was in danger, and these issues were fairly submitted by the court.

The only other question presented in the motion for rehearing is that the court erred in submitting the question of appellant's right of self-defense, independent of his right to defend against an assault made on his wife. Appellant contends there is no evidence raising the issue of appellant's right to defend against danger or apparent danger to himself. Appellant testified to trouble at the barn over a mule, when deceased had said: "Well, G—d d—n you, I will beat the G—d d—n

hell out of you." That he and deceased then had a fight, and deceased struck him with something hard, which he thought was a pair of knucks; that after they had been separated deceased had said, "I will whip the whole damned family." That his father had told him deceased had said he would kill him (appellant). That he tried to settle with deceased but could not do so, and deceased had told him, "I am not through with you yet, and if you don't come across I will whip you and your whole damned family off the face of the earth." It further appears that after this trouble appellant had notice served on Choat that he stood ready to comply with his (appellant's) contract with deceased, and unless deceased also complied with it he would consider the contract at an end and take legal steps to countermand it. When Choat got the notice appellant says deceased came to see him, and said, among other things, "Well, I've taken the notice you sent me to a fellow and he tells me I've got you where I can make you come across, and by G—d, if you don't, trouble ain't commenced." He also says he was told that Choat had said, "that the first man that came down there or interfered with him in his crop, he was going to kill him." That Mr. Smith had told him about Choat saying that he would kill the first man who interfered with him in his crop, and that Choat was a dangerous man, and that he (appellant) had better be very careful; that Mr. Branch had told him Choat would hurt him; that he, appellant, ought to be careful for he (Branch) knew what he was talking about. He said Willis Bryant had told him Choat had said, "he could whip him (appellant) every morning before breakfast, and then do a day's work"; that Grady Branch told him he saw Choat cleaning up his gun and practicing with it. He also testified that Robertson had told him that Choat had trouble in Oklahoma, and had had trouble everywhere he went, and was a dangerous man, and one you would be likely to have trouble with any time. Many other instances are recited by appellant, and his conduct on occasions which would indicate that appellant had a right to believe his life was in danger from Choat, and that Choat was a dangerous man. On the day of the killing Mrs. Barnett testifies about going in the field after the mules; about Choat's conduct, and that just before the shooting she heard Choat call to his wife, "Bring it here—I will get part of them," and at that time it looked like Mrs. Choat was trying to get something out from under her dress. Appellant also introduced Mrs. Smith, Mrs. Middleton, Miss Pope, Mrs. Myrick, and Miss Browning, all to prove that Mrs. Choat had admitted to them she had a pistol under her dress at this time. This alone would authorize the court to submit self-defense from apparent danger to appellant. He and Choat alone had had trouble; the threats shown all went to show that it was appellant for whom Choat felt animosity, and the person he had threatened to kill. Appellant also testified that before the shot he heard deceased call to his wife, "Come and bring it to me, I will get part of them." That after the shooting and while Choat was lying on the ground, he saw Mrs. Choat with a pistol in her hand, and heard deceased again say,

"Bring it here, I will get part of them yet," and he told Mrs. Choat not to give it to him, or he, appellant, would shoot Choat again. With this testimony in the record, and the testimony of the previous fight, threats to kill appellant, etc., if the court had not submitted the issue of his right to kill from apparent danger to himself, and his failure to do so complained of by appellant, we would feel impelled to reverse the case for that reason and the court did not err in submitting that issue to the jury.

This disposes of all the questions raised in the motion for rehearing. The State's evidence would show that appellant had also made threats after the first fight in the barn. On the day of the fatal difficulty Mrs. Choat says that after she and her husband returned to the field to work and found the mules in the field, that she remained in the field for about forty minutes working, and then went to their home for a rope with which to catch and tie the mules. That on her return she saw Mr. and Mrs. Barnett and their two sons, Padgitt and Jimmie. That Mrs. Barnett and Jimmie went down in the field, and she passed Mr. Barnett at the fence as she went into the field. That Mrs. Barnett and Jimmie got after the mules, and her husband also; that as she joined her husband she looked and saw appellant coming across from the field from the northwest. That before a word was passed appellant shot; that her husband then asked appellant to let him alone, but without saying a word appellant shot again and her husband fell. That her husband moved a little, and appellant called deceased a d—n son of a bitch, and said if he got up he would shoot him again, and he would teach him who to threaten, and for deceased not to say a G—d d—n word. Dr. Hennen said the shot entered the left arm, went into the arm pit and passed through, cutting several blood-vessels; that the wound was necessarily a fatal wound, and was made while the arm was down by the side.

We are of the opinion that the motion for rehearing should be overruled.

*Overruled.*

DAVIDSON, JUDGE.—I will write later. This judgment should have been reversed.

DAVIDSON, JUDGE (dissenting).—I am of opinion that for several reasons this judgment should have been reversed. The change of venue should have been granted as prayed for by appellant. The application for change of venue was sworn to by 150 compurgators from practically all sections and precincts of Hunt County. It alleges both grounds: prejudice and combination of influential people. These compurgators make it plain that the prejudice was so intense in the county that appellant could not obtain a fair and impartial trial, and it would come fairly within that rule as well as of prejudgment of the case. Mr. Leddy, of counsel for the State, testifies as follows: "I observed that the greater portion of those 150 names were from scenes reasonably

close to the killing—the large majority; some of them come from every precinct in the county; the affidavits filed contain names in every voting box; there might have been some from Caddo Mills but I don't remember seeing any; there might have been two or three there but not very many. There were some from the Campbell precinct and down south of town here at Quinlan and Cash—more from those precincts than from the other precincts in the county. I suppose Commerce is a little further than twenty-five miles from Lone Oak and is in the northeast part of the county. Wolfe City is in the northern part of the county something like about thirty miles from Lone Oak; Celeste is about thirty-two miles, I think, from Lone Oak—about twelve miles to Celeste and about twenty to Lone Oak. I have not visited the precincts of Wolfe City, Celeste, Caddo Mills, Floyd and Campbell for the purpose of hearing this matter discussed, but I have been to several of the precincts since June 26th." The killing occurred at Lone Oak, in the southeastern portion of the county. Campbell is about ten miles, it seems, north from Lone Oak. The other villages and towns mentioned are in different sections of the county, from which the 150 compurgators came. The controverting affidavit was signed by Mr. Leddy, the district attorney, Mr. Thompson, Owens, Turner, and Harrell, stating the usual ground, towit: that these men were not sufficiently informed to know whereof they speak in their affidavit. There is quite a lot of testimony introduced with reference to the compurgators and where they live and who they were. The evidence overwhelmingly shows many of them were among the most respectable citizens of the county, men of integrity, well informed, and placing them above reproach so far as their integrity and character is concerned. The affiants for the State show, as I understand this record, the sentiment against the defendant to such an extent that the venue should have been changed upon their statement. For instance, Mr. Harrell, who signed the State's controverting affidavit, says: "I don't know who signed the affidavits to the application. I don't know their opportunities to know the conditions of the parts of the county where they have gone or live; I only give my opinion of the condition of the county over where I live in Wolfe City. The sentiment seems to be pretty hard against the defendant in Wolfe City. . . . The people that I have heard express themselves in the case have been unfavorable to the defendant; there are people in the community that I haven't heard express themselves one way or the other. So far as my knowledge of the sentiment from the expressions I have heard, they are unfavorable and against the defendant." Mr. Turner lived at Commerce. Some of the 150 names attached as compurgators to appellant's application lived at that place, and among these are Mr. Acker, Dr. Wheeler and Dr. Smith, Mr. Wynn, the cashier of the bank there, L. L. Knight, J. M. Wright and Dave Finley. Mr. Turner says: "I could not tell you whether Dr. Wheeler's opportunity for knowing the sentiment of the people in the country around there is better than mine; he goes around more than I do." Then he mentions a great number whom he knew also signed as com-

purgators. "I don't know and haven't had an opportunity of knowing their means of knowledge as to whether they knew of any prejudice against the defendant, or of a combination against him; I suppose they could have known that and me not be advised about it. In making this affidavit I didn't mean to say that those people you have mentioned didn't know themselves of any prejudice against this defendant, I only made it in my judgment."

Mr. Owens, another State affiant, testified he lived at Commerce. He says: "I have no knowledge or means whereby I can determine as to their opportunity for finding out the sentiment in this county as to the Barnett case or against the defendant, Bob Barnett; I don't know anything about the extent to which they were acquainted in the county; I didn't know as to whether they knew of any combination against the defendant or not and don't know whether they knew of any prejudice against the defendant." This witness takes up quite a lot of the compurgators, showing them to be men who mingled and mixed with the people a great deal. I do not recall any evidence which shows that the compurgators are uninformed of conditions in Hunt County.

The appellant's witnesses make it clear that he could not get a fair and impartial trial in the county. Some of the State's witnesses said they thought he could get a fair and impartial trial, and some seem to think any man could get a fair and impartial trial if they could secure a jury. I do not purpose to follow up or quote the testimony, as it is very voluminous, covering at least 150 pages of the record. It covers fairly the whole of the county, some of which is quoted above, as has been mentioned by Mr. Leddy in his statement.

As to the combination, it is shown that about 176 different parties contributed to a fund to employ counsel to prosecute, and that the firm consisting of Messrs. Clark & Leddy was employed and prosecuted the case in a very efficient manner, filing briefs as well in this court, and one member of that firm argued the case orally before this court. It is also shown that just after the homicide at Lone Oak several automobiles were employed or used by prominent citizens of Lone Oak in going to the county seat at Greenville, where the District Court, presided over by Judge Dohoney, was then in session. They demanded of him that he empanel a grand jury at once and try the defendant. He empaneled the grand jury and a bill of indictment was returned, but on application of the appellant the cause was continued. This continuance was more or less criticised over the county. It is shown without controversy that this is the first instance in the history of the court presided over by Judge Dohoney of a grand jury being empaneled. These parties were vigorous in the prosecution, and successful. There is evidence tending to show that they visited to some extent over the county getting up funds, etc. Some of the papers published head-lines and articles under the head-lines deprecating in strong language the homicide and used pretty vigorous language, which was circulated among the people. Speaking of the list of contributors to the fund for employing counsel, Mr. Leddy says: "There are 172 names on the

list and the subscriptions ranged from $10 down—I think $10 was the highest. The list is composed of influential citizens of that precinct." Then follows the list, which shows 172 names, and cash besides, by others whose names are not mentioned, making the number 176, and one whose name is just put down as "W. F." It is also shown in this connection that there were about 6000 qualified jurors in Hunt County. This seems to have formed the basis to some extent why the change of venue was not granted. It occurs to me from a reading of this record that if there has been a case before this court in which a change of venue ought to have occurred, this is the case. Certainly a man is entitled to a fair trial before an impartial jury, and this is not fairly answered by the statement that the district judge saw and heard the witnesses. Every district judge who tries any question hears and sees the witnesses and decides upon what he thinks is right about it. If because he heard the witnesses and decides in favor of the State is to be the criterion of a man's right to have a fair trial, it would be useless to appeal; in fact, that would deprive him of the benefit of an appeal. I have always been under the impression that the right of appeal was granted for the purpose of reviewing the rulings of the trial judge and not make them final because he happens to see and hear the witnesses. Great deference is to be paid to the conclusion of the trial court in matters on appeal for good reasons. This is to be always regarded. Many of the cases have been collated by Mr. Branch in his work on Criminal Law in section 199. He states tersely and correctly a rule that has been followed by this court, towit: "If testimony shows that defendant might get a fair jury if culled and particularly selected, but if selected in usual way it would not be likely, and prejudice is shown, motion should be granted. Barnes v. State, 59 S. W. Rep., 882; Randle v. State, 34 Texas Crim. Rep., 43, 28 S. W. Rep., 953." He also states another rule which I have always understood to be not only correct but followed by this court in its various decisions. That rule is thus stated: "If case is prejudged, or if it is a notorious crime, and prevailing sentiment is that defendant is guilty, change of venue should be granted. Randle v. State, 34 Texas Crim. Rep., 43, 28 S. W. Rep., 953; Meyers v. State, 39 Texas Crim. Rep., 500; Gallaher v. State, 40 Texas Crim. Rep., 296; Faulkner v. State, 43 Texas Crim. Rep., 311; Alarcon v. State, 47 Texas Crim. Rep., 415; Dobbs v. State, 51 Texas Crim. Rep., 629; Cortez v. State, 44 Texas Crim. Rep., 176; Barnes v. State, 59 S. W. Rep., 882; Gallagher v. State, 55 Texas Crim. Rep., 50; Smith v. State, 45 Texas Crim. Rep., 405."

The great bulk of this testimony is to the effect that the sentiment was so strong against appellant that he could not get a fair and impartial trial. I might repeat the testimony of quite a number of these witnesses, but the facts as stated by them are in the record and it would serve no useful purpose. The great weight of the testimony places it beyond hope of a fair trial, many of the witnesses going so far as to say they had never heard anybody speak favorably of appellant, and

that he had a bad case; some said he ought to be hung, and the great weight of the testimony is that he ought to be punished. The writer is clearly of the opinion that the combination was sufficiently shown to entitle appellant to a change of venue for that reason. As I understand this record this fact was barely, if at all, controverted. Enough of the testimony bearing on this issue has been stated to show, by the action of the 176 who subscribed money to prosecute appellant, and the vigor shown by the people in that action in appearing before Judge Dohoney and demanding the organization of the grand jury and the immediate prosecution and conviction of defendant, in my judgment, sufficiently such a combination existed as to have required a change of venue from that viewpoint. But these facts were strengthened by other evidence in the record as I read it. I do not care to follow this question further.

2. The court intermingled charges on self-defense from two standpoints. First, from the defense of appellant's wife; second, the defense of himself. Exception was taken to that part of the charge submitting self-defense as to the defendant personally. I believe this proposition is correctly asserted. Briefly, bearing upon this issue, it may be stated that deceased, Harrison Choat, obtained or rented from appellant land which lay adjoining appellant's residence, consisting of fifteen acres, which was planted in cotton. The terms of the rental contract, or whatever it may be termed, were that Choat was to cultivate the land and appellant to furnish the team and feed for the team and tools and all those sort of things. In other words, it is what is termed *a contract on the halves.* There had been trouble between them about one of the teams prior to the day of the homicide, in which Choat (deceased) had given appellant a beating, being physically able to do so. On the day of the homicide appellant and one of his boys were hauling oats. At the noon hour they fed their team in a lot or barn and took a "siesta." When he awoke he was informed of the fact that his mules, which he had been working to the wagon hauling oats, had gotten out and were in the cotton. His son was sent for the mules, and deceased, who was hoeing cotton, refused to let him get the mules, stating that he would get them. The boy returned and informed his father, who said he would go. The wife said, "No, you will get into trouble, I will go." So, she took one of the little boys and went after the mules and tried to get them back in the lot. It seems the cotton field was not clean, there was grass in it, and the mules were enjoying themselves eating the grass. But be that as it may, the wife and boy went down and deceased undertook to prevent them from getting the mules, and sent his wife to the house for a rope. While she was gone Mrs. Barnett and her little boy were trying to drive the mules to the lot. Appellant, seeing the attitude of things, got his gun and went in the direction where they were. The self-defense proposition here asserts itself. Deceased was approaching Mrs. Barnett with an uplifted hoe, and, as shown by the map in the record, getting further away from appellant, perhaps with his right side partly to appellant; he was some distance

away, not coming towards but going from appellant, and was not making any demonstration towards him, but going towards Mrs. Barnett with an uplifted hoe, whereupon appellant shot. As I understand the law in Texas, this does not raise the issue of self-defense as to appellant personally. Deceased was not making any attack or threatening one on appellant, but was making an attack, from appellant's standpoint, upon appellant's wife with the hoe. That this hoe was a deadly weapon used by a strong, vigorous man like deceased is shown to have been, ought not to be questioned, at least not seriously. If there had been any evidence suggesting the fact that appellant may have been in danger at the time, or that deceased was making an attack directly or indirectly upon appellant at the time, the court would have been correct in submitting the issue of self-defense from both standpoints. He should not, however, divert the case from its merits and put into it another issue not made by the facts. To say the least of it, it is not in the case, and it may have influenced the jury to believe the court did not believe the self-defense theory that he was attacking the wife, when he included in his charge an attack on the husband of the wife. Just how far a favorable charge under ordinary circumstances would be erroneous or not is sometimes difficult to say, but it ought not to be a difficult question to solve that any charge which would divert a case from its merits and real issue to a false issue would tend to minimize the real issue in the case and treat the accused legally unfair. The trial court does not believe the testimony of the defendant that his wife was being attacked, and, therefore, he put into the case another issue not made by the facts. The jury were authorized so to believe. I do not care to pursue this further.

As also hurtful in this connection on self-defense, the court gave a charge on threats, applying the threats against the life of the defendant. This intensifies the above error. The court gave the following charge at the request of the State:

"You are instructed that, at the time of said homicide, the running at large in Hunt County of mules was prohibited under the laws of this State.

"If, therefore, you believe from the evidence that the defendant's mules entered enclosed lands leased and occupied by Harrison Choate and were roaming about the cultivated land of the said Harrison Choate, without the consent of said Harrison Choate, then you are instructed that the said Harrison Choate had the lawful right to impound said stock and retain the same in his possession until it was determined by three disinterested freeholders appointed by the justice of the peace of said precinct what damages, if any, had been done to the crop of the said Choate by said mules and what fees, if any, he was entitled to under the law for impounding said stock."

Exception was reserved to this charge. Why this charge should have been given, or how it got into the case the writer does not understand. Choat had made a contract with the defendant on terms already stated. In other words, he was a *cropper on halves*. The mules had gotten into

the field accidentally, or had broken the fence rather, and gotten into the cotton. Choat had not reduced the mules to possession. He had not control of them; he had not impounded them, and was not entitled to any fees under the statute. The right to impound, if true, did not give right to prevent appellant's recapture of his mules. The right to do a thing is quite different from actually doing it. The civil statute authorizes the taking up and impounding stock running at large when stock law is in force, and after the party gets possession of or impounds stock, he may have his neighbors, as provided by statute, assess damages. But I do not understand how that question is in this case. He had not impounded the stock, and until appellant sent down after his stock had paid no attention to them. They were grazing on grass among the cotton, and deceased had refused to let the boy take them out, but he had not reduced them to possession. If deceased had obtained possession of the mules, and was holding them, possibly the question might be in the case, but the mind of the writer is not clear even upon that question under the facts of this case. These facts were treated below as constituting the relation of landlord and tenant, and the right of deceased to take up the stock grew out of that relation, and the charge was given as though deceased had taken up and impounded the stock, which entitled him to fees. I do not understand this to be a tenant contract, and in Texas the authorities all hold the other way, showing it was not. The authorities might be collated and copied at length. It will be sufficient to quote one and refer to the others, as they are all in harmony: In Rogers v. McGuffey, 96 Texas, 565, Judge Williams, rendering the opinion for the Supreme Court, makes this statement:

"McGuffey sued Rogers to recover damages for breach of a contract for the rental of fifty acres of land, alleging that he had rented the land for the year 1901, and in pursuance of his contract, broke six acres of stubble land, reasonably worth $6, and was at other expense in connection with the land in the sum of $270, and that the contract was breached on January 1, 1901. That under the terms of the contract appellant, Rogers, was to furnish the land, teams, tools, farming implements, and food for the teams, and the crops of corn and cotton were to be equally divided between landlord and tenant. He claimed the value of one-half of what he would have raised as his damages."

So it will be seen the terms of the rental contract in the instant case were practically as those in the case quoted. The question certified to the Supreme Court involved the proper measure of damages, and in the opinion the court, speaking through Associate Justice Williams, said:

"In the Capps case the court applied the measure generally considered to be applicable in cases where ordinary contracts for the renting or letting of land are broken. In such cases, this measure is applied because it in fact gives compensation for the loss actually sustained in the absence of special damages. But contracts like the one in question have additional elements. The parties entering into them stipulate for shares in the crops to be produced as the benefit to be derived from

them. The owner of the land expects the share reserved to himself as a return for the cultivation of his land and his other outlay. The benefits expected by the other party are employment and the stipulated return for his labor, and sometimes a home for the time. To deprive him of these benefits is to deprive him of that which, in the very contract, both parties to it contemplate he shall receive. It would seem to follow necessarily that his damages should be compensation for what he thus lost. In such a contract the parties enter into a joint business enterprise and stipulate what shall be the advantages to each. When one wrongfully deprives the other of those advantages he should be required to compensate him for that which the contract stipulated he should have. The objects of the contract have a close analogy to those of a partnership and, in so far as employment for the labor of one of the parties is one of the purposes, to the contract for personal service."

This shows that this was not a rental contract in the ordinary acceptation of the term, but in the nature of a joint tenancy or partnership. In Rogers v. Frazier, 108 S. W. Rep., 727, the question is gone into more fully. That case holds it does not constitute what is termed the relation of landlord and tenant. Deceased in this case is what is termed in the books and in the decisions a "cropper." The deceased had no such interest in this property as would have debarred appellant of the right of a joint tenant or partner in looking after the business. He had an interest in the crop which would have entitled him to a damage suit either against deceased or for trespass by others. The authorities in Texas, as I understand them, both by the Supreme Court and the Courts of Civil Appeals, all go to the same extent. One other quotation perhaps it might be well to make. In Doke v. Railway Co., 126 S. W. Rep., 1195, Doke being the owner of the land, brought suit against the railroad company for the destruction of growing crops cultivated by his so-called tenants, and the tenants also brought separate suits against the railway company, and when the cases came for trial they were consolidated and the court charged the jury that, under the evidence, they would not be authorized to return a verdict in favor of the plaintiff Doke for any damage resulting from injury to crop. Passing upon this charge the court said:

"The question for us to determine is, did the plaintiff, Doke, have an interest in the crops damaged by the overflow of the land? This question is to be determined from the contract between the land owner, Doke, and the respective tenants. If he had no interest therein, the charge of the court is correct. If he had an interest in the crops, it is not correct. In the case of Horseley v. Moss et al., 5 Texas Civ. App., 341, 23 S. W. Rep., 1116, this court held a contract by which the landlord was to furnish to the tenant the farm tools, team and feed to do the work in making the crop which was to be divided equally between the landlord and tenant gives the owner of the land a specific interest in the crops, and not merely a landlord's lien. In the case of Tignor v. Toney, 13 Texas Civ. App., 518, 35 S. W. Rep., 881, the court of the First District held that, where one farms the land of another under an

agreement by which he is to give the land owner a part of the crop raised on the land, he and such owner, in the absence of a stipulation in the contract otherwise providing, became tenants in common of the crops. To the same effect is the recent holding of this court in the cases of G., C. & S. F. Ry. Co. v. Caldwell, 102 S. W. Rep., 461, and Rogers v. Frazier Bros. & Co., 108 S. W. Rep., 727. This is in accord with the great weight of authority. 18 Am. & Eng. Ency. of Law (2d ed.), p. 274. There is nothing in the opinion in the case of T. & P. Ry. Co. v. Nayless, 62 Texas, 570, which contravenes this holding. It follows the charge was error."

If these authorities are correct, the court was clearly wrong in charging the jury as he did with reference to impounding the stock. The question was not in the case. The difficulty arose over the fact that appellant's wife and son were trying to put the mules back in the lot, which had escaped accidentally, and deceased was trying to prevent them getting the mules. Neither had possession, but both trying to secure it. It would be a curious proposition to announce that joint tenants or any other citizen of Texas, whether tenant or not, would be deprived of the right to go after his stock when they escaped from his custody and secure them, because somebody in the neighborhood might have a chance to catch them for prowling upon their land. Fees are not allowed for the escape, but only for impounding. This is confined to the party impounding the stock and only after impounding. The stock must first be caught. Such proposition as that would not strike the fair-minded man as being otherwise than legally unfair, illegal and unjust, at least it strikes the mind of the writer that way. If the proposition asserted in the charge is correct, every time a mule or horse or a cow of a citizen escapes he is debarred the right or privilege of going after his escaped property and securing it. He has, therefore, lost his right to recapture his property until some neighbor takes the stock up and puts them in a pound and compels him to pay the impounding fees, etc. Such construction of the impounding law will find no warrant in any decision anywhere that I have found as heretofore written, nor ought it be held to be the law. If so, escape of stock forfeits right of capture.

There is another question in the case. The character or reputation of deceased seems to have been an issue in the case some way, and testimony was introduced to the effect and some of the testimony went to show he was a man of peaceable disposition and along that line his reputation was good. Perhaps if it had stopped here it would hardly have been an error, but some testimony was admitted over objection of appellant as to the individual opinion of witnesses about what they knew about deceased. Objection was urged to all that character of testimony. The contention seems to be that because some evidence was introduced which possibly was legitimate, therefore they could go beyond that and prove facts inadmissible. In other words. because some testimony is admissible, therefore it is no error to admit inadmissible

testimony. This is not correct. It would hardly be contended that a witness could testify as to his personal views of the character of a man, under ordinary circumstances at least. Witnesses could testify as to general reputation, but because they could do that did not render admissible the other inadmissible testimony.

I am firmly convinced that appellant has not had a fair trial, and that this judgment ought to have been reversed and the cause remanded.