## FRANK SQUYRES v. THE STATE.

No. 6417.  Decided February 8, 1922.

Rehearing Granted May 3, 1922.

Rehearing Denied June 21, 1922.

**1.—Murder—Charge of Court—Practice in Trial Court.**

Where, upon trial of murder and a conviction for that offense, the evidence raised the issue of murder, there was no error in submitting a charge thereon.  Following Jones v. State, 47 Texas Crim. Rep., 515, and other cases.

**2.—Same—Requested Charge—Practice in Trial Court.**

Upon trial of murder, there was no error in refusing a requested charge to the effect that by insulting words or conduct towards a female relative is meant all such words ·of deceased towards the wife of the defendant as may be insulting to the wife of the defendant or defendant himself, there being no evidence upon which to base the requested charge.

**3.—Same—Manslaughter—First Meeting—Charge of Court.**

·Where the court had already given, in his main charge, an instruction upon the subject of first meeting, to which there could be no objection, there was no error in refusing a requested charge on the same subject.

**4.—Same—Jury and Jury Law—Householder—Voter.**

Where, upon trial of murder, it was discovered after the trial that one of the jurors was not a naturalized citizen or a householder, this question could not be raised after the trial of the case and motion for new trial, although it would have been a cause for challenge if it had been known at the time when the juror was examined on his voir dire.  Following Watson v. State, 32 Texas Crim. Rep., 432, and other cases.

**5.—Same—Rehearing—Murder—Charge of Court.**

Where it was a question whether the defendant was informed of the insulting words and conduct of the deceased towards the female relative; whether thereby his mind was inflamed to a degree rendering it incapable of cool reflection; whether the homicide took place upon the first meeting, were all questions of fact for the jury and the court was justified in submitting the charge on murder.  Following Art. 1135, Penal Code.  Distinguishing Doss v. State, 43 Texas Crim. Rep., 551.

**6.—Same—Manslaughter—Charge of Court—Insult to Female Relative.**

For failing to respond to appellant's objection to the court's main charge on manslaughter, and limit the submission of that issue to the only fact which authorized the charge on the law of manslaughter, namely, that of insulting conduct towards a female relative, the judgment must be reversed and the cause remanded.

**7.—Same—Charge of Court—Insulting Conduct to Female Relative.**

Where the defendant did not hear the deceased utter the insulting words, or see his insulting conduct, and the homicide did not take place until some time thereafter at the first meeting between the parties after defendant had been informed of such conduct, a charge of the court to the effect that under the immediate influence of sudden passion was meant that the act must be directly caused by the passion at the time of the killing, was reversible error. Following Stuart v. State, 52 Texas Crim. Rep., 382, and other cases.

**8.—Same—Charge of Court—Manslaughter—Rule Stated—Sudden Passion.**

One of the principal ingredients or elements of ordinary manslaughter to wit, that the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation, is not applicable to a case where the insulting words or conduct were not indulged in the presence of the slayer. Following Nyland v. State, 19 Texas Crim. App., 174.

**9.—Same—Charge of Court—All Facts and Circumstances.**

Where the record was bare of any circumstances which would raise the issue of manslaughter save that of insulting words or conduct, a charge to the jury to consider all the facts and circumstances in evidence in determining the facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, was improper. Following Redmond v. State, 52 Texas Crim. Rep., 595.

**10.—Same—Charge of Court—Manslaughter—Rule Stated.**

In instances in which the accused, by his exception to the charge of the court and requested charges, affirms and insists that he depends upon no other matter to reduce the grade of homicide than insulting words or conduct to a female relative, and the evidence suggests no other, the court should frame his charge in accord with that view. Following Attaway v. State, 41 Texas Crim. Rep., 395, and other cases.

**11.—Same—Charge of Court—Adequate Cause—Rule Stated—Passion.**

When there is no dispute in the record as to the existence of one of the adequate causes named in our statutes (insult to female relatives in this case). the trial court should affirmatively instruct the jury that if such cause existed, the jury were called upon to decide only whether the homicide resulted from passion arising therefrom, or resulted from some other cause

Appeal from the District Court of Shelby. Tried below before the Honorable Charles L. Brachfield.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Davis & Davis,* and *Sanders & Sanders,* for appellant.—Cited cases in opinion.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Conviction is for murder. Punishment ten years in penitentiary.

On December 2, 1919, appellant killed John Richards by shooting him with an automatic pistol. The killing occurred at the home of Edward Hammer, a brother-in-law of appellant. Appellant, his wife and the deceased were all practically raised in the same neighborhood. Some fifteen years before the homicide deceased and Alice Hammer had been sweethearts and engaged to be married. The engagement was broken off and deceased had married another, with whom he had lived up to about two years prior to the homicide when his wife died. Deceased had not remarried. Some five or six years after the engagement between Alice Hammer and deceased had been broken appellant married the said Alice, who was ten years his senior, appellant being at the time of the marriage about sixteen years of age. About October 15 appellant and his wife went to visit and spend the night with Edward Hammer, where the homicide afterwards occurred. Edward Hammer lived on premises rented from deceased's mother and in a house about fifty yards from where deceased and his mother lived. While on this visit appellant's youngest child was taken ill and among other neighbors who came to offer and render assistance were deceased and his mother. Appellant's wife claimed that one morning while she was at Edward Hammer's house deceased came into the room where she was nursing the child and said to her, "I hear you are fixing to go to Louisiana." That upon being informed by her that this was true, deceased told her he wished she would give up appellant and stay there and that he would take care of her all her life. She says she informed deceased she did not care anything about him; whereupon he took hold of her arm and said: "You let me love you once, and you will care something for me;" whereupon she told him she was going to tell appellant; that deceased replied it would not do any good as he was going to get him out of the way; that deceased then left. The State controverted the issue that deceased was present on the occasion when appellant's wife claimed this conduct occurred, and introduced evidence for the purpose of attempting to show that he was not present at that time. Appellant's wife made no report of the occurrence to her husband at the time, nor to her sister, although the latter was in the kitchen and her husband near the house cutting wood. Shortly after this appellant and his family moved to Louisiana where he secured work in the oil field. While looking at a house which they had rented appellant stated that he would return to Texas and get their household goods. Appellant's wife objected to this and when pressed for her reason claims to have told appellant of what had transpired between her and deceased, and that she was afraid for him to come back to Texas for fear deceased would kill him. Appellant did return to Texas however, boxed up his household goods and shipped them back to Louisiana. While in the

same neighborhood where deceased lived preparing his household goods for shipment appellant claims he did not see deceased. Appellant's lease on the house he rented in Louisiana was to expire on December 1st, and they were short of money. Appellant's wife had sold her interest in some property to her brother, Tom Hammer, and a note for $300 was due her from him on December 1st. Appellant and his wife claim that they came back to Texas for the purpose of getting this money in order that they might return to Louisiana and make arrangements for other living quarters. On the night of their arrival in Texas they remained at Tom Hammer's house. The next morning appellant, his wife and their children, Tom Hammer's wife and several children, got in appellant's car and with appellant driving went over to visit at Edward Hammer's, where the homicide occurred.

Deceased had come over to Edward Hammer's house on the morning in question to get him to help in cutting wood, but a light rain was falling at the time and Edward Hammer promised deceased he would help him as soon as it quit raining. Several other parties were at Edward Hammer's house at this time. The mail man came by and four or five of them, including deceased, went to the mail box which was something like one hundred yards from Edward Hammer's house. As appellant came from Tom Hammer's to Edward Hammer's place he passed this mail box where deceased and the other parties were, driving within ten or twelve feet of them. Four of the parties who were present with deceased at the mail box testified that they saw and recognized appellant as he passed and one of them spoke to him and waved at him, but without getting a response. Appellant drove past the mail box and stopped his car in front of Edward Hammer's residence and he and all of the occupants of the car went into the house. Appellant claims not to have seen deceased as he drove by the mail box. Within a short time deceased and the other parties returned to Edward Hammer's house and as deceased stepped up on the gallery appellant, from inside of the house or about the door, began shooting him, and he fell upon the gallery. Deceased had a slicker over his shoulders and appellant says just as he stepped on the gallery he dropped his arms down to his sides and from what his wife had told him he feared he was going to shoot him, although he admits on cross-examination he believed he would have killed him any way had not this demonstration been made. All other eyewitnesses disclaimed having seen deceased make any demonstration of any kind and some of them testified positively that he made none. Immediately after the shooting appellant walked out of the house past deceased, and in reply to a question as to why he had killed him said: "He has ruined my life and I have stood it as long as I can." The testimony was that after the shooting appellant seemed to be excited; that he got in his car and undertook to turn around and disabled it in some way. He got out of the car and went to the home of a relative and attempted

to get in touch with the sheriff by telephone. Appellant then went on to town and surrendered to the constable. The deceased was entirely unarmed at the time of the homicide. The record furnishes no motive for the killing other than deceased's alleged conduct towards appellant's wife.

Exceptions were reserved to that portion of the court's charge submitting murder, it being urged that the evidence made out only manslaughter at most. A special charge was requested directing the jury to acquit of murder. It is also contended that a new trial should have been granted because the evidence will not support a murder conviction. These matters are presented in bills of exception. 1, 3, 6, and 9, and may be considered together. We believe it would have been an unwarranted invasion of the jury's province for the court to have withdrawn from their consideration the issue of murder. The jury were warranted in concluding that appellant saw deceased and passed within fifteen feet of him at the mail box. Furthermore, adequate cause for passion must not only be shown, but the act must be upon the passion before a homicide can be manslaughter. If the mind be capable of cool reflection the homicide is murder. All of these questions were for the jury. Pitts v. State, 29 Texas Crim. App., 337; Gillespie v. State, 53 Texas Crim. Rep., 168; Jones v. State, 47 Texas Crim. Rep., 515; Jones v. State, 33 Texas Crim. Rep., 392.

Appellant excepted to subdivision 2 of paragraph 7 of the court's charge (bill No. 4) and to paragraph 9 (bill No. 5) wherein the court explained to the jury what was meant by adequate cause; the objection being that the court ought not to have explained "adequate cause" generally, but should have limited the jury solely to the question of adequate cause based upon insulting conduct toward appellant's wife. The court did tell the jury that insulting conduct toward the wife of one accused of homicide would be adequate cause. These portions of the charge excepted to, taken in connection with the entire charge, were proper instructions and could not possibly have confused the jury in any way or been harmful to accused.

The complaint presented in bill No. 7 occurs to us to be an unwarranted criticism of an isolated sentence in one paragraph of the charge. The court told the jury that by the expression "under the influence of sudden passion" was meant: "(1) That the act must be directly caused by the passion at the time of the killing." The criticism is, that the effect of the quoted language was to limit the jury to a provocation at the time of the killing. By no sort of construction can we attach that meaning even to the isolated sentence. It states tersely the proposition that passion must be operating to cause the act resulting in the killing. This is the law.

Appellant requested the court to give the following special charge:

"You are charged as a part of the law of this case that if the defendant, Frank Squyres, was informed and believed that the deceased

John Richards had been guilty of insulting words and conduct towards the wife of defendant, that the same constituted 'adequate cause' as that term is used in law; and that upon and after receiving such information, the defendant was under no duty or obligation to seek deceased and ask for an explanation of such words and conduct or to give the deceased an opportunity of explaining such words and conduct; that, on the contrary, if, on his first meeting with the deceased, as that term is elsewhere defined and explainel to you, the defendant, acting upon such information and belief, and under the influence of either of the emotions of the mind known as anger, rage, resentment or terror, sufficient to render his mind incapable of cool reflection, shot and killed the deceased, John Richards, then he would be guilty of no greater grade of offense than manslaughter, regardless of the fact that no explanation was asked and no opportunity given for such explanation.''

The court had already in his main charge instructed the jury as follows:

''I charge you that insulting words or conduct to a female relative constitutes adequate cause, provided the killing, if any, took place so soon thereafter as the party killing may meet with the party killed after having been informed of such insult. In this connection I charge you that the word 'meet' as used herein signifies and means that the parties must see each other and be brought into such proximity as would enable the defendant to act in the premises. And it is immaterial whether the insult actually occurred, or if it occurred, whether it occurred in the manner or way in which it was related to him, if the party believed them to be true. So if you believe that Frank Squyres was informed that deceased had insulted his wife by words or conduct and believed the same, and that at the time of the killing was the first meeting between him and deceased, keeping in view the definition and explanation given in this paragraph as to the word 'meet,' then that would constitute adequate cause within the meaning of that term.

(10) If you believe from the evidence beyond a reasonable doubt that the defendant, with a deadly weapon, in a sudden passion arising from an adequate cause, as the same has been hereinbefore explained, and not in defense of himself against an unlawful attack producing, a reasonable expectation or fear of death or serious bodily injury, with intent to kill, did, in the County of Shelby, and State of Texas, on or about the date alleged in the indictment, shoot John Richards with a pistol and thereby kill him, as charged in the indictment, you will find the defendant guilty of manslaughter and assess his punishment by confinement in the State penitentiary for a term of not less than two nor more than five years. If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty.''

We can see so little difference between the charge as given by the

court and that requested by appellant that the necessity for giving the special charge is not apparent to us. The special charge incorporated the idea that appellant was under no duty or obligation to seek deceased and ask for an explanation or to give him an opportunity of explaining his conduct. We have been unable to see why this should be injected into the charge. It is not disclosed by the record that it was in any way contended by the State that appellant was under any such duty or obligation. We think the charge as given by the court sufficiently guarded the rights of appellant with reference to the issue of manslaughter without the necessity of burdening the jury with the requested charge which was practically to the same effect, but with an improper issue connected therewith.

A special charge was requested on the issue of threats. (Bill No. 11). We have examined the same in the light of the main charge, and believe the latter fully protected appellant's rights in so far as the question of threats was involved, and that no error was committed in refusing the special charge upon the same subject.

Appellant requested a special charge which was brought forward in bill of exceptions No. 12 instructing the jury that by "insulting words or conduct towards a female relative is meant all such words of deceased towards the wife of defendant as may be insulting to the wife of defendant or defendant himself." We believe no error was committed by the court in refusing to give the charge. The evidence does not raise the issue that the wife in the instant case did not regard the conduct of deceased as insulting, because her testimony is to the effect that she immediately resented the words and conduct of deceased and told him that she intended to inform her husband thereof. Hence we see no necessity of injecting into the case the issue presented in the special charge.

We think the court committed no error in refusing appellant's special charge No. 4 as brought forward in bill of exceptions No. 13, upon the subject of what is meant under the law by the first meeting between the parties. The court had already given in his main charge an instruction upon that subject of which appellant could have no just ground of complaint. Indeed, in one respect it was more favorable than appellant could have demanded. As we find the charge copied in the record, it requires not only that the parties be brought into such proximity as to enable appellant to act in the premises, but also that they "see each other."

It is made to appear by bill of exceptions No. 16 that A. J. Wigley was one of the jurors. Upon his voir dire examination he answered that he was a qualified voter and a householder. Appellant developed the fact that Mr. Wigley was born in England. He had served on juries in other felony cases in Texas. Not until after the trial was it discovered that he was not a naturalized citizen. Mr. Wigley declared his intention of becoming a citizen of the United States in March, 1890,

but took no further action to perfect his citizenship. He thought he had done all that was necessary to become a citizen of the United States and of Texas. He had voted since the declaration was made and had served on juries in various courts. It may be conceded that neither appellant nor his counsel knew what the true facts were at the time Mr. Wigley was taken on the jury, and it may also be conceded that they are not chargeable with negligence for not having ascertained these facts prior to accepting him as a juror. The Act of Congress, 1910, amended the naturalization laws, and made the declaration of intention filed in 1890 non-available as a basis for filing petition for naturalization. No question is raised by appellant but that the juror Wigley was a fair and impartial juror and no injury is sought to be shown by reason of his serving on the jury. It is urged that because he was an alien he was a disqualified juror and for that reason alone appellant should have been awarded a new trial. We will not discuss the question at any length as the decisions of our own courts both in criminal and civil cases, as well as those in many other jurisdictions, have decided this question adversely to appellant's contention. If the alienage of the juror had been known at the time he was being examined for jury service, would have been a cause for challenge, but it is no ground for a new trial, although not discovered until after the termination thereof. Leeper v. State, 29 Texas Crim. App., 63, 14 S. W. Rep., 398 (in which three cases cited in appellant's brief are expressly overruled) ; Mills v. State, 34 S. W. Rep., 270; Martinez v. State, 57 S. W. Rep., 838; Williamson v. State, 36 Texas Crim. Rep., 229; Mays v. State, 36 Texas Crim. Rep., 437; Bartlett v. State, 82 Texas Crim. Rep., 468, 200 S. W. Rep., 839; Sutton v. State, 31 Texas Crim. Rep., 297; Watson v. State, 82 Texas Crim. Rep., 462, 199 S. W. Rep., 1098; St. Louis B. & M. Ry. Co. v. Broughton, 212 S. W. Rep., 669; German v. H., & T. C. Ry., 222 S. W. Rep., 662. (See many authorities cited in last case) ; Schuster v. La Londe, 57 Texas, 28. The decisions of other jurisdictions are in accord with our own. We do not cite them all, but in Queenan v. Oklahoma, 61 L. R. A. 324, many of them will be found referred to. See also Corpus Juris, Vol. 16, Sec. 2649.

Our disposition of the foregoing questions renders it unnecessary to notice bill of exceptions No. 15.

The judgment of the trial court is affirmed.

*Affirmed.*

ON REHEARING.

May 3, 1922.

MORROW, PRESIDING JUDGE.—The evidence, in our judgment, would not justify the failure to submit the issue of murder. Whether the appellant was informed of the insulting words and conduct of the deceased towards the female relative; whether thereby his mind was

inflamed to a degree rendering it incapable of cool reflection; whether the homicide took place upon the first meeting, were all questions of fact for solution, not by the court but by the jury. Jones v. State, 33 Texas Crim. Rep., 492. In Article 1135 of the Penal Code, it is said:

"The jury shall be at liberty to determine in every case whether under all the circumstances insulting words or gestures were the real cause which provoked the difficulty."

Instances have arisen in which the conviction of murder has been set aside because the character of the evidence showing that adequate cause existed; that the passion was engenderd thereby, and that the homicide took place at the first meeting, was such that no conclusion could be reached other than the true cause of the killing was the passion created by the insulting conduct towards the female relative. Among these are Doss v. State, 43 Texas Crim. Rep., 551, to which appellant refers. We do not regard that case as a precedent which would require the trial court in the present instance to have refrained from instructing the jury upon the law of murder.

In failing to respond to appellant's objections to the main charge on manslaughter and limit the submission of that issue to the only facts which authorized the charge on the law of manslaughter, namely, that of insulting conduct towards the female relative, we have concluded upon reconsideration, that there was prejudicial error.

Appellant did not hear the deceased utter the insulting words, nor did he see his insulting conduct. The homicide did not take place immediately but did take place, according to the theory of the appellant, at the first meeting with the deceased after the appellant had been informed by his wife that the insulting words and acts had taken place. Various specific objections were urged against the charge, and bills of exceptions were properly preserved, calling in question the court's ruling. Special emphasis is laid upon the criticism of the charge wherein the term "sudden passion" is used. Upon this subject, the court gave the usual charge on manslaughter, telling the jury that manslaughter was a voluntary homicide committed under the immediate influence of sudden passion arising from adequate cause; that by the expression "under the immediate influence of sudden passion" is meant: (1) That the act must be directly caused by the passion at the time of the killing; (2) The passion intended is either of the emotions of the mind known as rage, anger, sudden resentment or terror, rendering it incapable of cool reflection.

Objection was also urged to that phase of the charge contained in paragraph (9), which we copy:

"It is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith all the facts and circumstances in evidence, and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool re-

flection, and that the facts and circumstances were sufficient to produce such a state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law; and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the killing and the adequacy of the cause, if any, producing such condition.''

Appellant insists that notwithstanding the paragraph of the charge which we have copied in the original opinion, that in response to his objections, the charge should have been amended for the reason that there was but one state of facts relied upon by him to reduce the offense to the grade of manslaughter. Supporting this contention, we are referred to the case of Stewart v. State, 52 Texas Crim. Rep., 283. That case was one in which Stewart presented the theory that he killed the deceased at the first meeting because of information received from his wife to the effect that the deceased had been guilty of insulting conduct towards her. A charge, so far as it related to the subject of ''sudden passion'' not different from that now under consideration, was reviewed and held, in the light of the objections urged, to be prejudicial error, the court using this language:

''Wherever the insulting conduct is relied upon to reduce the killing to manslaughter, and the information is conveyed to the slaying relative, the question is not one of suddenness of passion, but it depends, first, upon the fact that he was so informed; and, second, that at the time of the killing his mind was incapable of cool reflection;. that is, the condition of his mind as to its incapacity for cool reflection is not relegated to that portion of the statute which requires it to be sudden, for that only applies where the killing occurs upon the happening of the event. Without going further into this question, we cite in support of this: Bays v. State, 50 Texas Crim. Rep., 548, 17 Texas Ct. Rep., 981; Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Williams v. State, 24 Texas Crim. App., 637; Richardson v. State, 28 Texas Crim. App., 217; Martin v. State, 40 Texas Crim. Rep., 665; and Whaley v. State, 9 Texas Crim. App., 306.

Examining some of the cases upon which this conclusion is based, we find that they deal with instances in which not only the idea of ''sudden passion'' is embraced, but also that in which the idea is conveyed to the jury that the provocation must arise at the time of the commission of the offense. The principles controlling the cases, however, seem not different from those which operate under the present facts. Quoting from one of the earlier cases, namely, Eanes v. State, 10 Texas Crim. Rep., 445, we reproduce these remarks of Presiding Judge White:

''The general rules with regard to ordinary cases of manslaughter are modified necessarily by our statute in permitting this character of defense. It is expressly provided that 'insulting words or conduct of the

person killed towards a female relative of the party guilty of the homicide,' (Penal Code, Art. 597, subdiv. 4) shall be deemed an adequate cause to reduce a homicide from murder to manslaughter. Not only so, but the statute further provides that such cause shall be deemed sufficient if it is made to appear 'that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, *or so soon thereafter as the party killing may meet with the person killed, after having been informed of such insults.*' Penal Code, art. 598. Thus, it will be seen that one of the principal ingredients or elements of ordinary manslaughter, viz.: 'that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation' (Penal Code, art. 594), is not applicable to a case where the insulting words or conduct were not indulged in in the presence of the slayer, for he may kill on the first meeting after learning that the provocation of which he personally knew nothing, had been committed. Up to the time of this first meeting, the law prescribes no limit for the subsidence of the passion supposed to be engendered by the information received.''

By the terms of Article 1133 of the Penal Code, when the ground stated above is relied upon, it must appear that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, *or so soon thereafter as the party killing may meet the party killed after being informed of such insults.* Commenting upon this, the court, in Niland's case, (19 Texas Crim. App., 147) says:

"Thus it will be seen that one of the principal ingredients or elements of ordinary manslaughter, viz., 'that the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation,' is not applicable to a case where the insulting words or conduct were not indulged in in the presence of the slayer."

Having this in mind, the instructions such as we have quoted from the court's charge, that is, that he (the accused) must act under the immediate influence of sudden passion; that the killing must be directly caused by the passion at the time of the homicide; that if the jury find that the facts and circumstances were sufficient to produce such a state of mind in a person of ordinary temper, have no appropriate relation to the questions to be determined by the jury. As indicated in Stewart's case, supra, the language used is calculated to confuse the jury rather than to lead their minds directly to the question at issue. In a case where the facts are like those before us, and objections are specifically made to embrace such matters in the charge, they should be eliminated.

In the part of the charge quoted in this opinion, the jury was told to consider all the facts and circumstances in evidence in determining whether the facts and circumstances were sufficient to produce

such state of mind in a person of ordinary temper. The record is bare of any circumstance which would raise the issue of manslaughter save that of insulting words or conduct. Whether insulting words or conduct were adequate cause is not a question for the jury. It was their office to determine whether the appellant had been informed of the insulting words or conduct by the deceased and if he believed the information to be true, then adequate cause existed as a matter of law. In Redman's case, 52 Texas Crim. Rep., 595, the sole ground of provocation was insulting words or conduct, and an intimation in the charge that there may have been other causes was held erroneous. The court said:

"Appellant insist that said paragraph is erroneous in that it presents other than insulting words concerning a female relative, whereas there was no evidence suggesting any other provocation than insulting words concerning a female relative of appellant. This criticism is correct."

The wisdom of addressing the charge in all cases to the issues that arise upon the trial commends itself to all. This has often been emphasized in the decisions of this court dealing with the law on manslaughter where the only ground of provocation was one of those named in the statute as adequate cause as a matter of law. See Attaway v. State, 41 Texas Crim. Rep., 395; Warthan v. State, 41 Texas Crim. Rep., 389; Connell v. State, 45 Texas Crim. Rep., 162; Branch's Ann. Tex. Penal Code, Sec. 512. In instances in which the accused, by his exceptions to the charge and special charges affirms and insists that he depends upon no other matter to reduce the grade of homicide than insulting words or conduct to a female relative and the evidence suggests no other, the court should frame his charge in accord with that view.

Because of the error pointed out, the rehearing is granted, the affirmance set aside, and the judgment of conviction reversed and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

June 21, 1922.

LATTIMORE, JUDGE.—The case is before us upon the State's motion for rehearing. It is insisted that we erred in directing a reversal of this case because of confusing and contradictory matters appearing in the court's charge upon the issue of manslaughter. We are clearly of opinion when there is no dispute in the record as to the existence of one of the adequate causes named in our statute, the trial court should affirmatively instruct the jury that if such cause existed the jury were called upon to decide only whether the homicide resulted from passion arising therefrom, or resulted from some other cause which might make the case murder or justifiable homicide, as the case

may be. In our view of this record the testimony of the wife of appellant presented without dispute the existence of adequate cause consisting of insulting words and conduct to her by deceased. Granting the existence of such adequate cause, and also the fact that the homicide did not take place until some time after information thereof was conveyed to the appellant, the giving in the charge of what was the original statutory definition of manslaughter as it existed prior to the enactment of present Article 1133, Vernon's P. C., and as it still is and applicable to most cases of manslaughter,—could hardly be other than productive of confusion in the minds of a jury composed of laymen. They were told in the charge that manslaughter is a killing brought about by the immediate influence of sudden passion. The jury were then confronted with the proposition that the accused was told of the insults by his wife and went about his business and did not meet deceased for some time after, at which meeting the killing occurred. It is easy to conceive the condition of perplexity and confusion that might exist in the minds of the jury as they try to reconcile the proposition that appellant was laboring under such passion as to render his mind incapable of cool reflection at the time of the homicide, —but same could not reduce the killing to manslaughter unless it was sudden passion.

It seems to us that the question in a case such as the one before us should be submitted in the clearest manner possible, and the jury should be told without confusing statements that if the wife of appellant communicated to him the fact of insulting words and conduct on the part of deceased and the killing took place at the first meeting of the parties thereafter, and they believed that the mind of the appellant was laboring under such passion as to render it incapable of cool reflection, and that such passion arose from and grew out of the insulting words and conduct and caused the act of the accused, then a conviction could not be had for a higher grade of homicide than manslaughter. These propositions we believe to be supported by the authorities and to be those announced in our former opinion reversing this case.

Being unable to conclude that any error appears in said judgment of reversal, the State's motion for rehearing will be overruled.

*Overruled.*