## JACK HALL v. THE STATE.

No. 14869.   Delivered April 6, 1932.
State's Rehearing Denied May 11, 1932.
Reported in 49 S. W. (2d) 793.

The opinion states the case.

*Chas. Gibbs, J. W. Stovall* and *H. O. Williams,* all of San Angelo, and *Russell & Starley,* of Pecos, for appellant.

*Roy I. Biggs,* District Attorney, of Pecos, *J. B. Cotten,* County Attorney, of Crane, *Clyde E. Thomas,* of Big Spring, *Morriss & Morriss,* of San Antonio, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CALHOUN, JUDGE.—The offense, murder; the punishment, thirty years in the penitentiary.

The deceased, Barnsley, was a ranchman and lived with his family on his ranch.  Adjoining the ranch on the west was the ranch known

as the Red Bluff or old McIntyre pasture. In the last-named pasture, deceased had a lease on a number of sections. This ranch extended from the west boundary of deceased's own ranch for some distance west to the Pecos river. Appellant worked as a cow hand for deceased for about a year up to August, 1929, and subsequently had worked for an adjoining ranchman, Jim Tubb. In the fall before the killing, the appellant and Jim Tubb formed a partnership in a bunch of cattle and were running these cattle in the Red Bluff pasture. Appellant was living in a house on the river in that pasture. Previous to the killing, litigation arose between Tubb and deceased over the respective lease holdings and the respective number of cattle they should run in the Red Bluff pasture, but in January, 1931, this litigation was settled by contract between deceased and Tubb, to which contract appellant was not a party, it not having appeared at that time that appellant had an interest therein. Appellant refused to be bound by said contract claiming an interest both in the cattle and in the lease, whereupon deceased filed suit in the Crane county district court on February 13, 1931, procuring a temporary injunction restraining Tubb and appellant from pasturing more than the stated number of live stock on the Red Bluff pasture. About the time of the injunction order, according to the state's evidence, appellant began manifesting animosity towards and making threats against deceased and threatened to shoot deceased and to whip him. On the morning of the killing, the deceased had gone to his son's house, and, after unloading some posts that he had in his truck, he was told by his son that the river was getting low, and deceased stated he would go and see about it. Deceased drove off alone in his truck and drove up to some pens 300 yards above appellant's house and turned his truck around and was driving back towards his ranch on the same road over which he had come, when overtaken by appellant.

The only eyewitness to the killing, outside of the appellant, was one Bird Reed, a boy between 16 and 17 years of age, who was with appellant at the time of the killing. He testified in substance as follows: That on the evening of the day before the killing he went to the appellant's house to take a horse belonging to appellant; that he stayed all night at appellant's house with the appellant, and they were the only ones there. He testified that the next morning they got up and fed some saddle horses and appellant was going to take him to school, and they ran appellant's car out of the garage to put some oil in it; that appellant told him to bring his gun to him and he brought it out and gave it to him; that it was a pistol. He testified that while they were putting the oil in the car, the deceased drove up to the point of the hill and turned around; that he guessed it was about a quarter of a mile from the house to the bend where he saw deceased turn around. He testified that he said to the appellant, "It is Mr. Barnsley," and appellant replied, "Yes, it is

the old s— of a b— sneaking around while he thinks I am away"; that afterwards he and appellant drove towards Buena Vista, going in an opposite direction from where he had seen the deceased driving his truck; that after they had gone some little distance, appellant stopped his car and stated, "I believe I will turn around and go back and see what the old s— of a b— wants"; that he did turn around and started back in the direction they had seen the deceased take; that they overtook the deceased and the appellant drove right up by the side of deceased's car; that they both stopped their cars about the same time, and appellant then said to the deceased, "Hello, Jack," and the appellant then said, "I want to know what in the hell you are doing over here"; that the deceased replied, "I have a right over here," and the appellant replied, "I want you to know that this is not Tubb you are fighting with now"; that the deceased said, "O, s—t," and at the same time made a movement of some kind around behind him; that he, the witness, could not see his arms all the way down because of the position he was sitting in. That the appellant then said, "I will teach you, you long nosed son of b—"; that he did not remember exactly just what he said, but the appellant jerked his gun and shot immediately after the deceased had made that movement. He testified that deceased was turned towards him and looking towards them and sitting under the steering wheel, and that he was sitting there when the appellant grabbed his gun and fired. He testified that he was sitting on the right side and that put him between the appellant and deceased. The cars were close together; that after appellant fired the shot he started his car and said to him, "I will take you home and go on to Crane and give up," but before he made that remark he said, "There is one s— of a b— that won't do me no more dirt or won't bother me any more"; that after appellant fired the shot he sat there and looked at the deceased for a while; that deceased fell over on the steering wheel and he saw blood coming out of the deceased's head; that after they had started, the appellant told the witness, "Be sure and not say anything about it," and the witness told him that he would not, but that before that the appellant said, "How did you like the way I hit him right in the temple," or something like that; that when they got to a gate the witness offered to get out and open it, but the appellant told him he would get out and open it because he did not want them to see the witness' tracks. He testified that the appellant took him to the gin and the witness put his saddle out at the gin and the appellant told him, "Be sure and not tell anybody about the killing or about me being there"; that while they were passing some houses he told the witness to duck, that he did not want the Simmons or any other people to see him. He testified further that the appellant did not want anybody in town to see the witness with him that day. The witness further testified that at the time of the shooting he did not

see any pistol or gun in the deceased's possession and did not see anything that looked like any kind of firearm.

There was other evidence to the effect that the deceased was found in his truck leaning over the wheel of the said truck in an unconscious condition and that he died a short time after being found; that there was no weapon of any kind on his person or in his truck. Appellant claimed that he acted in self-defense.

The trial judge instructed the jury upon the law of provoking the difficulty as a limitation upon the law of self-defense. Appellant objected to the charge on the theory that the testimony failed to raise the issue of provoking the difficulty. To render an appropriate charge on the law of provoking the difficulty, there must be evidence that the accused willingly and knowingly used some language or did some act before meeting his adversary which was calculated to lead to a fray or deadly conflict, and, unless such act was reasonably calculated and intended to have such effect, the right of self-defense could not thereby be forfeited. Crowley v. State, 117 Texas Crim. Rep., 372, 35 S. W. (2d) 437; Roberson v. State, 83 Texas Crim. Rep., 244, 203 S. W., 349, and authorities therein cited; Carlile v. State, 96 Texas Crim. Rep., 37, 255 S. W., 990.

"While defendant must have said or did something at the time of the homicide to provoke deceased to attack him so as to have a pretext for killing the deceased, yet prior acts will be looked to to give character to what defendant said or did at the time of the homicide so as to determine his intent and to explain his words and acts." Branch's P. C., sec. 1954; McGrew v. State (Texas Crim. App.), 49 S. W., 228; Mason v. State, 72 Texas Crim. Rep., 501, 163 S. W., 66.

We are not prepared to say that the evidence introduced by the state did not warrant the court in instructing the jury upon the issue mentioned. There was evidence offered by the state that the appellant previous to the difficulty had given some expression of ill feeling towards the deceased and had made threats to whip him and also to kill him. It is also in evidence that the appellant, just previous to the difficulty, followed the deceased and overtook him. When he had overtaken him, appellant began the conversation with the deceased, and during said conversation used language towards the deceased which the jury might have deemed to be reasonably calculated to provoke the deceased and bring on a conflict. In estimating the words and conduct of the parties, their relation to each other cannot be ignored. We think the evidence, under all the facts and circumstances, justified the learned trial judge in instructing upon the law of provoking the difficulty as a limitation upon appellant's right of self-defense.

Complaint is made of the refusal of the trial court to grant appellant's motion for a change of venue in the case. Upon the hearing of

said motion, the facts were fully developed and a number of witnesses testified that appellant could receive a fair and impartial trial in Crane county. The testimony on said hearing was ample and sufficient, in our opinion, to authorize the trial court in overruling the motion. We do not believe that any abuse of discretion on the part of the trial court is shown. Unless it is clear that the trial court has abused or arbitrarily exercised his judicial discretion, his action in refusing a change of venue will be sustained on appeal. Branch's Penal Code, sec. 299; Barnett v. State, 76 Texas Crim. Rep., 555, 176 S. W., 580; Evans v. State, 110 Texas Crim. Rep., 560, 9 S. W. (2d) 360; see, also, Minor v. State, 108 Texas Crim. Rep., 1, 299 S. W., 422.

Appellant complains of the action of the trial court in refusing to quash the venire drawn by the jury commission in this case; the reasons assigned for the motion to quash being that one of the jury commissioners who selected the venire, as well as some of the veniremen, did not reside in Crane county but resided over the line in Upton county. The contention is based on the uncertainty of the location of the east boundary line of Crane county because of an attempted relocation of the boundary line between Crane and Upton county made by one J. J. Goodfellow. The state, through its district attorney, filed a contest, contesting the motion to quash. The issue being joined, the court heard evidence upon this issue, and the matter was again fully heard on motion for new trial. The court's qualification to the bill, No. 14, wherein this issue is brought before this court, shows that each venireman or juror mentioned in the bill of exception answered upon his voir dire examination that he was either a householder in Crane county or freeholder in Texas, and he had resided in the State of Texas more than a year and in Crane county more than six months; that he was a married man living with his family in Crane county and had control and management of the house in which he lived at the time of the trial; that in passing upon and determining the county of residence of all the various veniremen whose places of residence were questioned by the defendant, the court did not undertake to locate the exact geographical line between Crane and Upton counties, but determined such place of residence with reference to where the said county line was commonly reputed, accepted, and recognized as laying by the people of said counties for governmental purposes, such as voting, taxation, and scholastic purposes and in electing school and county officials, and also selecting jurors heretofore, and also endeavoring to locate monuments on the ground and determining common repute as to the location of such line. The J. J. Goodfellow line not having been accepted by Upton county because of Upton county's claiming said line to be further west. That each of the veniremen and H. D. Schmolhorst, the jury commissioner, lived in the strip between the J. J. Goodfellow survey and where the county line was commonly reputed, accepted, and recognized as being

for governmental purposes. The qualification to said bill further shows that two of the veniremen who appellant claimed to be disqualified were each peremptorily challenged by the state.

There is no complaint urged as to any injury resulting to the appellant by reason of any juror sitting in the case. Had any of the jurors complained of been a disqualified juror by reason of not living in Crane county, then in the absence of any injury shown, same would not be a ground for setting aside the verdict and granting a new trial. See Ames v. State, 102 Texas Crim. Rep., 190, 277 S. W., 661; Squyres v. State, 92 Texas Crim. Rep., 160, 242 S. W., 1024.

By timely exception, the appellant objected to part of paragraph eight of the court's charge, said paragraph being as follows: "In prosecutions for murder, it is necessary, before conviction can be had, that it be shown from the evidence beyond a reasonable doubt that there existed in the mind of the accused, at the time of the killing, an intent to kill; and unless there did exist in the mind of the accused, at the time of the act resulting in the death of another (if it did), such intent to kill, then the act can not constitute murder. The intent to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of an forbidden act."

The appellant excepted to said paragraph of the court's charge because of the following language: "The intent to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act," for the reason that such language carried a suggestion to the jury that, because of the fact that the defendant had a pistol which was an unlawful weapon, the jury should thereby assume that the defendant intended to commit a forbidden act, and that the court charged the jury that he did intend to commit an offense prohibited by law. That part of paragraph 8 complained of is an exact copy of article 45 of the Penal Code. Besides being confronted with the proposition as to whether or not the charge in this case should have been given as a charge upon the weight of the evidence, we are also confronted with the proposition that it is merely given as an abstract proposition without any application. We also have two affirmative propositions given in said charge: (1) That the fact that the intent to kill must be shown from the evidence beyond a reasonable doubt, and (2) that the intent to commit the offense charged is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act. The charge could be easily interpreted by the jury to mean that, because the appellant shot the deceased with a pistol, the intent to commit the offense charged would be presumed, and that the burden of proof was upon the appellant and not upon the state to show that there was no intent to kill.

It has been held improper in a number of instances to give this article

in charge to the jury against the defendant, because the presumption of innocence is stronger than any presumption of guilt arising merely from the means used to accomplish the guilty purpose, and the burden rests upon the state in a criminal trial to overcome the presumption of innocence by establishing the guilt of the accused by legal evidence beyond a reasonable doubt. Jones v. State, 13 Texas App., 1; Black v. State, 18 Texas App., 124; Thomas v. State, 14 Texas App., 200; Brinkhoeter v. State, 14 Texas App., 67; Luera v. State, 12 Texas App., 257; Bell v. State, 17 Texas App., 538; Richardson v. State, 32 Texas Crim. Rep., 524, 24 S. W., 894; Ainsworth v. State, 8 Texas App., 532; Dubose v. State, 10 Texas App., 230; Richardson v. State, 32 Texas Crim. Rep., 524, 24 S. W., 894. Also, Bowman v. State, 38 Texas Crim. Rep., 14 40 S. W., 796; Snead v. State, 40 Texas Crim. Rep., 262, 49 S. W., 595.

The only defense set up in this case by appellant was that of self-defense. No other independent and distinct fact was relied upon by the appellant in this case. The fact that appellant shot and killed the deceased with a pistol was not questioned. The issue in the case was whether or not the intent to kill was formed from malice or from a belief in the necessity of self-defense. The matter for decision of the jury was whether the killing was lawful or unlawful. The jury could have held the charge as applicable to no other question. It tends to conflict with the charge on the presumption of innocence necessary in every case. Under the facts in evidence in this case, the giving of that part of the court's charge complained of, we think was prejudicial error, and is such error, that having been excepted to, calls for reversal of the case.

The other contentions of appellant are deemed to be without merit, particularly in view of the court's qualification to the bills presenting the matters complained of.

For the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—The state has filed an exhaustive motion, and supplemental motion for rehearing, reviewing the authorities referred to in our opinion, and citing others believed to hold contrary views to those announced by us. We have gone as carefully as we could over the arguments and citations, regarding the precedent of this decision as important, and further that a correct decision in this particular case is also of importance.

It must be plain that there was no sort of controversy upon this trial

over the proposition that the weapon used by appellant and the manner of its use, was deadly. Nor was there issue made in testimony as to the intent of appellant to kill; the state's contention, supported by its evidence, being that appellant with a pistol at close range, with malice, shot and killed deceased. Appellant contended that he, with a pistol, at close range, shot and killed deceased in self-defense.·

The offense charged, the conviction sought and had, was murder with malice. No theory of accidental killing, or of a murder without malice, or of lack of intent to kill, or of the use of a weapon not per se deadly, was advanced by appellant. These statements if true,—and they are,—differentiate this case and eliminate from consideration most of the authorities cited in the state's supplemental motion, beginning with Murray v. State, 1 Texas App., 417, and ending with Collins v. State, 108 Texas Crim. Rep., 72, 299 S. W., 403. Analysis and review of the cases would be interesting, but it must be at once apparent that cases like those of Murray v. State, supra; Gatlin v. State, 5 Texas App., 531; Bell v. State, 17 Texas App., 538, and others cited, in which were issues of manslaughter vs. murder with express malice,—a homicide on the one hand, where the mind of the slayer was so inflamed as to render it incapable of cool reflection,—and, on the other hand, the theory of murder for hate, revenge, or pay. These all were cases involving necessarily the intent of the accused in such way as to make justifiable a charge that the character of the weapon used by the accused might shed light upon and raise a presumption of intent to commit the offense. Likewise in cases such as Hatton v. State, 31 Texas Crim. Rep., 586, 31 S. W., 679; Campos v. State, 50 Texas Crim. Rep., 102, 95 S. W., 1042; Cade v. State, 96 Texas Crim. Rep., 523, 258 S. W., 484; Collins v. State, 108 Texas Crim. Rep., 72, 299 S. W., 403; in all of which the weapon used appeared not deadly per se, or if deadly same was not used in a manner calculated to kill, or some similar principle was involved,—in which cases the propriety of giving in charge article 45, P. C., or its equivalent, would appear so sound as not to be worthy of dispute. But citation or analysis of such cases gets us nowhere in solving the question of the possible harm to the accused of giving in charge said article 45, P. C., in a case upon facts such as those set out in our original opinion and which confront us here.

The intent to kill was established by the testimony both of the state and the defense, but this by no means carried with it, or conceded the establishment of that which was the only real issue arising under the facts in this case, that is, whether there was an intent to commit murder. What did the court tell the jury in said charge? We again quote: "The intent to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act." What "offense" was charged in this case? There is but one answer, murder. What was the "forbidden act" in this case? This question must receive

the same answer. Would the shooting of one with a pistol in the temple ordinarily result in the commission of such "forbidden act?" Undoubtedly yes.

In one place in the charge his honor, the trial judge, said that in all criminal cases the defendant is presumed to be innocent until his guilt is established beyond a reasonable doubt, but in that part of the charge under consideration he said to the jury,—in indisputable effect,—if this man used a pistol and intentionally shot the dead man with it, his intention to murder him would be presumed. Clearly this would be capable of great harm to the rights of the accused.

Precedents, if applicable, mark the path trodden by our predecessors, and ought, if correctly followed, to lead to uniform and right decision, but we must never lose sight of the rule always sound and to be kept in view,—that the facts of each case determine the law applicable. If it had never been said before, it ought to be said here, on the sharp and decisive issue in this case upon which and only which could this appellant hand a thread of hope of acquittal, that is, that while he did intend to kill, he only intended to kill in self-defense, and did not intend to murder,—that on such facts the giving in charge of article 45, P. C., was a transgression of the rights of the accused, whether he be guilty as Hades or innocent as an angel of light, for which this case should be reversed.

The state's motion for rehearing will be overruled.

*Overruled.*